# FRANK G. SCHENUIT *vs.* INTERNATIONAL FINANCE CORPORATION.

*Assignment—Of Non-Negotiable Chose in Action—Recoupment as Against Assignee—Defects in Goods Sold—Evidence.*

An assignee of a non-negotiable chose in action takes it subject to all the legal and equitable defences of the obligor or debtor to which it was subject in the hands of the assignor.
p. 414

In an action by the assignee of invoices for the price of goods sold by the assignor to defendant, the latter may recoup for breach of the assignor's warranty, by reason of defects in the goods, which existed at the time of the assignment and notice thereof, although not then discovered, this being a defense which would have been available against the assignor.      p. 415

In an action by the assignee of a chose in action, defendant was not prejudiced by the admission of a copy of a notice sent to him of the assignment, if he afterwards admitted receiving the notice.                              p. 416

Under a claim for recoupment, in an action for the price of tires, on account of defects therein, evidence as to the number of such tires which defendant still had on hand, not yet tested by use by the latter's customers, *held* admissible, tires of like make and grade having been delivered to defendant by plaintiff's assignor, during a period of eighteen months, under the same contract, the same percentage of defects having been discovered in all those tested by use, and no effective change in the method of construction having been made during that period.                              pp. 416, 417

*Decided June 11th, 1925.*

Appeal from the Superior Court of Baltimore City (STANTON, J.).

Action by the International Finance Company against Frank G. Schenuit, trading as the Schenuit Rubber Company. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and WALSH, JJ.

*J. Le Roy Hopkins,* for the appellant.

*James Morfit Mullen,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellee, the International Finance Company, brought suit in this case against the appellant, Frank G. Schenuit, trading as the Schenuit Rubber Company, to recover the aggregate amount of certain invoices of tires sold to the appellant by the Delion Tire and Rubber Company, which invoices were assigned by the latter company to the appellee.

The declaration consists of six of the common counts and two special counts. The first of the special counts was for goods sold and delivered by the Delion Company to the appellant and assigned by it to the plaintiff; and the second, for money found to be due from the defendant to the Delion Company on account stated between them, which it had assigned to the plaintiff.

To the declaration, the defendant first pleaded "never indebted as alleged" and "never promised as alleged," and later filed in addition thereto a plea of set-off, containing the common counts and two special counts.

The case, when tried by the court sitting as a jury, resulted in a verdict and judgment for the plaintiff. From that judgment the appeal in this case is taken.

In the trial of the case five exceptions were taken, one to the court's rulings upon the prayers and the others to the rulings on the evidence.

The tires above mentioned were manufactured and sold under a written contract made by the Delion Company with

the appellant, dated June 15th, 1922. The contract was to go into effect August 1st, 1922, and was to end on the first day of August, 1923, though, by its provisions, it could be renewed "at the end of the term for one year, and every year thereafter for a yearly term" so long as it was mutually agreeable. It was, however, within the power of either of the parties thereto, if he or it so desired, to terminate the contract before the term expired upon giving the other party sixty days notice in writing; but as expressed in the contract, if it went over, the term should be understood "to run from year to year." It was during the second year of the contract, and while it was still in force, that the invoices mentioned were, in the month of December, 1923, assigned by the Delion Company to the appellee, the International Finance Company.

The contract between the parties contained, among others, the following provisions:

"That the party of the second part (the Schenuit Rubber Company) will furnish all the necessary equipment such as moulds, rings, cores, etc., as specially designed for the manufacture of his double grip cord tires at his own expense and maintain the same in repair.

"The party of the first part (the Delion Company) will manufacture for the party of the second part his double grip cord tires out of the same materials as it manufactures Delion cord tires at this date, the same to be manufactured at its plant at Fifth and Eager Streets, Baltimore, Maryland, and to be the same quality as Delion cord tires in materials and workmanship.

"The party of the first part agrees to manufacture and deliver at its plant in Baltimore, Maryland, and the party of the second part agrees to purchase at least five thousand (5,000) tires during the twelve months term of this contract, and to purchase and take as minimum four hundred fifty (450) tires per month of the several sizes. The party of the first part will make and deliver a maximum of two thousand (2,000) tires per month, if the party of the second part desires

the same to be made, the minimum amount to be manufactured and taken by the party of the second part being four hundred and fifty (450) per month and the maximum being two thousand (2,000) per month.

"The party of the first part will sell to the party of the second part upon terms of payment, as follows:

"The party of the first part will pay for all goods manufactured in any month and sold hereunder on the 10th of the month following, but in order that the parties hereto may be helpful to each other in handling their mutual credits, the party of the first part agrees to take the trade acceptances or notes of the party of the first part, payable sixty and ninety days after date to the extent that it may be able to discount said notes either through its own bank or that of the party of the second part in the City of Baltimore, Maryland.

"All tires manufactured and sold under this contract are sold under the manufacturers' standard warranty clause approved by the Tire Manufacturers' Division of the Rubber Association of America, Inc., and are warranted to be free from defects in workmanship or materials."

Under the above stated contract, tires were made and sold by the Delion Company to the appellant, and as a rule settlements were made therefor weekly by the appellant giving to the Delion Company trade acceptances for the amount then owing by him, payable in sixty days thereafter. These were assigned by the Delion Company to the appellee, the International Finance Company.

In arriving at the amount owing the Delion Company, at the time of such weekly settlement, the amount then known to be owing the appellant by the Delion Company on account of defective tires sold him was deducted from the amount owing by him for tires sold to such time and not paid for by him.

The written contract, which warranted the tires free from defects in workmanship and materials, provided no method

for ascertaining the extent of such defects in the tires or the loss to the appellant caused thereby, but as appears from the evidence, the parties orally agreed at the time of the execution of the written contract that the distance a tire was warranted in its use thereunder was ten thousand miles and it was upon that basis that the adjustments were made.

A tire, though defective in construction or in the materials used, which had gone that distance, was not regarded by them as defective within the meaning of the contract and no allowance was made therefor, but for one found to be defective, for the causes stated, that had not gone so far, an allowance was made, that is to say, if it had gone five thousand miles there was an allowance to the appellant of one-half of the purchase price, or, if it had gone less than five thousand miles, or more than five thousand miles and less than ten thousand miles, an allowance in like proportion was made.

When tires sold by the appellant to his customers were returned to him by them, because defective, they were examined by the appellant to ascertain if the defect complained of was one of construction or one caused by the use of defective materials, and if found to be defective from either of said causes, they were set aside by him and thereafter examined and passed upon by an employee of the Delion Company, and the extent of the defect and the loss to the appellant was ascertained.

It was by such method that the adjustments in regard to defective tires were made, apparently with no disagreement between the parties, until a short while prior to December, 1923, when, it seems, the appellant could no longer get the Delion Company to act upon his claims for defective tires, in consequence of which no trade acceptances were thereafter given, in as much as the amount to be allowed the appellant for defective tires had not been agreed upon.

Thereafter, commencing with December 6th, 1923, the invoices for tires sold by the Delion Company to the appel-

lant, without any allowance thereon to him for defective tires, were assigned to the appellee.

These assignments of invoices, numbering six in all, dated December 6th, 7th, 8th, 11th, 12th, and 13th, 1923, and amounting in the aggregate to $3,514.44, represented the last sales of tires made by the Delion Company to the appellant, and closed the dealings between them. Thereafter, on December 27th, 1923, the Delion Company was adjudicated a bankrupt.

The first formal notice to the appellant of these assignments was sent by the appellee to him through the mail on December 23rd, 1923, and received by him, as shown by post office receipt, on the 24th day of December, 1923.

This, however, was not the first notice that the appellant had of these assignments, for, as he says, when the Delion Company failed to send him the weekly trade acceptances, as they had been doing, he called upon its vice-president at its office to ascertain why they had not done so, and was told that the company was assigning the invoices to the appellee, to whom they had previously been assigning the trade acceptances, without deducting therefrom any allowance to him for defective tires, although he had sent to them his claims therefor. He thereupon went to the International Finance Company's office at Washington, and there saw Mr. Herrell, its president, and explained fully to him the way he and the Delion Company had been handling the trade acceptances, with all of which Herrell was at the time fully familiar. He then asked what would happen to the credits to which he was entitled for defective tires, and Herrell replied: "That will be your funeral and you had better watch your step * * * that is your hard luck, we are going to continue to discount them." The witness was further asked, "Was there anything discussed, or did you tell Mr. Herrell anything about the written contract, or did he tell you anything about it, in other words, did he know of the existence of this contract, and if so, how did you know he knew it?" Ans. "I told Mr. Herrell about the contract because I wanted to know whether

they (the Delion Company) were going to continue production, and Mr. Herrell said they were putting up the money because they had a mortgage on the property and they were going to continue to find out whether Mr. Price could take it over, and he advised me to continue dealing with the Delion Company because they were going to pull out of the woods, as he called it."

The conversation above referred to occurred, as stated by Schenuit, weeks before the Delion Company was adjudicated a bankrupt, and, as he says, Herrell at the time knew, and had for sometime known, of the Delion Company's financial difficulties.

Mr. Herrell, when upon the stand, admitted that Schenuit called upon him at his office in Washington at the time stated by the appellant, but he was not able to recall the conversation related by Schenuit in relation to the assignment of the invoices, though he could not say it did not occur, but he had no recollection of it; that, as he recalled, the conversation was in regard to the purchase by the appellant of bonds held by the International Bank against the Delion Company that he might get control or possession of that company, and did not recall his saying anything about the adjustment of his claims for defective tires.

The invoices were not paid by the appellant at the time they were claimed to be due and payable because, as stated by the defendant, the plaintiff's assignor, the Delion Company, was indebted to him in a larger sum than the aggregate amount of invoices, on account of defective tires for which no adjustment and allowance had been made. As shown by the evidence, the defects complained of were in what is called the bead of the tire and, when used, the tire would break at the rim. As stated by the appellant and corroborated by others, such defect in the tire could not be discovered until after it had been used; consequently the defect, though existing at the time when the tire was made, would not be disclosed until after the sale of the tire by the appellant and after its use by the purchaser. In some instances

a break in the rim, resulting from such defect would, in the use of the tire, occur much sooner than in others, and it was only when the break occurred that the appellant could make such defect known to the assignor of the appellee and claim therefor a reduction in the purchase price of the tire.

It is disclosed by the evidence that the appellant had from time to time made demands for losses suffered by him on account of defective tires. Some of these were made, but not allowed, before the assignment of the invoices, others were for losses caused thereby, where the defects were not discovered or disclosed until after the assignments. In addition thereto a further claim was made by him for losses resulting from defects yet to be disclosed, either in the unsold tires or in those which had not, at the time of the trial, been used for the distance hereinbefore named as the basis for the ascertainment of such defects.

The court, sitting as a jury, allowed appellant's claims for such defects in tires filed and made by him before the date of the assignment; and excluded those losses resulting from defects discovered after the assignment, but which existed at the time of the assignment, including those discovered prior to the trial and proven therein to exist.

The prayers granted the plaintiff were in accord with the action of the court in excluding the above mentioned claims of the defendant, thereby declaring the law to be that the defendant was not entitled to any credit or allowance for defective tires that had not been adjusted or agreed upon by the parties, or which had not matured, at the time of the assignment and notice thereof to the defendant, notwithstanding the same "may have arisen out of dealings or transactions between the said Delion Company and the defendant occurring prior to said assignment or assignments and notice thereof to the defendant," under the above mentioned contract made by them.

The defendant offered three prayers: By the first the court was asked to state the law to be "that the defendant is entitled to a deduction of the plaintiff's claim in such amount

as the court shall find the defendant should be allowed * * *
for defective workmanship, or materials" in the tires, not
confining such credits to defects adjusted or agreed upon by
the parties, or which had matured, before the assignment
and notice thereof to the defendant. This prayer, as well as
his others, was refused. The rulings on the prayers consti-
tute the fifth exception.

In support of its contention presented by its prayers, the
plaintiff has cited *Fusting v. Sullivan,* 51 Md. 489; *Rich-
ardson v. Anderson,* 109 Md. 641; and *Bank of Bristol v.
Balto. & O. R. Co.,* 99 Md. 661.

In *Fusting v. Sullivan, supra,* the appellee, Sullivan, in
1871 instituted an action of assumpsit against Joseph Fust-
ing. Pending the suit the defendant died, and his executors
were made parties and judgment was recovered against
them, which judgment on appeal was affirmed by this Court
on the 2nd day of December, 1874. On the 3rd day of De-
cember, 1874, the judgment was assigned by Sullivan to
James McDougall. This assignment was made, in pursu-
ance of a previous agreement, by means of an order of that
date directing the clerk of the Court of Appeals to enter the
judgment to the use of James McDougall. This order was
accidently mislaid and thereafter, on the 15th day of Decem-
ber, 1874, a like order was filed in the Court of Appeals, as
well as in the Superior Court of Baltimore City, where the
judgment had been recovered. A writ of *fieri facias* was
issued out of the Superior Court directed to the sheriff of
Baltimore City and was returned *nulla bona,* whereupon a
writ of *fi. fa.* was isued out of the Superior Court and di-
rected to the sheriff of Baltimore County. The defendants,
claiming a right to set off certain promissory notes of Sulli-
van held by them as endorsees, obtained from the Circuit
Court for Baltimore County an order temporarily staying
proceedings under the *fieri facias.* They then filed their
bill of complaint in the Circuit Court of Baltimore City
claiming the right to set off the promissory notes against the
judgment and execution, alleging the insolvency of Sullivan,

bringing into court the balance due upon the execution, after
deducting the amount of the promissory notes, and praying
an injunction restraining further proceedings on the *fieri
facias.* An injunction was issued as prayed, though dis-
solved after hearing, and from the order dissolving it, an
appeal was taken to this Court and the decree appealed from
affirmed. The notes claimed by the complainants to be an
equitable set off were made by Sullivan, payable to the order
of Richard K. Cross, and were endorsed and delivered by
him to said complainant, without recourse, on the 5th day of
December, 1874, two days after the assignment on Decem-
ber 3rd.

In that case the court said there were several insuperable
objections to the set-off claims by the complainants: First,
it appeared from the evidence that the judgment was assigned
to McDougall in good faith, and for a valuable considera-
tion, before the promissory notes came into the possession of
the complainants. Though the entry of the use was not
made upon the record till the 15th of December, the proof
shows that the equitable assignment was made on the 3rd
day of December, in pursuance of an agreement previously
made by Sullivan with McDougall, to assign the judgment
to him in case it should be affirmed on appeal. At the time
the assignment was made, there existed no equitable right
of set-off, or any cross-claim whatever by the defendants in
the judgment; the promissory notes were then held by Cross,
who was a stranger to the judgment. Under these circum-
stances, the transfer of the notes to the complainants could
not affect the rights of McDougall the assignee, who pur-
chased in good faith and without notice. Code, art. 8, sec.
3. Second, another objection to the set-off claimed was that
the promissory notes, even if they had been purchased in
good faith, and were held absolutely by the complainants,
did not constitute a cross-claim or "mutual debt" within the
meaning of the statute, because not held by them in the same
right in which they were liable upon the judgment. And
third, it appeared by the agreement between Cross and the
complainants that the transfer of the promissory notes was

not made absolutely and in good faith, but merely for the
benefit of Cross, to enable him to collect a debt which he
claimed to be due to him from Sullivan, by placing the notes
in the hands of the complainants conditionally, to be used
by them as a set-off against the judgment.

In *Richardson v. Anderson, supra,* it was held that a
person indebted to one who makes an assignment for the
benefit of creditors, can not set off against his debt, when
sued by the trustee under the assignment, a claim against
the assignor purchased by him after the execution of the
assignment, nor can a person in such suit set off against
such debt the payment made by him as an accommodation
endorser upon a promissory note of the assignor which be-
came due and was paid in part by him after the assignment.

In *Bank of Bristol v. Balto. & O. R. Co., supra,* there
was an assignment of a bill of lading and the principles of
law invoked in the decision of that case have no application
to the case before us upon the facts disclosed by the record.

The cases above cited differ materially from the case now
under consideration. In *Fusting v. Sullivan,* the claim
sought to be set off never came into existence until after the
claim, upon which the suit was brought, was assigned to
the plaintiff, and it was then acquired by assignment ap-
parently for the purpose of setting it off against the plain-
tiff's demand. While in *Richardson v. Anderson,* the claim
there attempted to be set off was, at the time of the assign-
ment, the mere liability of an endorser on an unmatured
note of the plaintiff.

In each of said cases the claim of the defendant had no
connection with the transaction out of which arose the cause
of action upon which the suit was instituted, but it grew
out of other altogether separate and distinct transactions;
and, as already said, the principles applied in the *Bank of
Bristol v. Balto. & O. R. Co.* do not apply to this case.

In the case before us, the claim of the defendant arose
out of the contract between him and the assignor of the
plaintiff, upon which the plaintiff's suit was instituted, and
though the plea of set-off was filed in the case, the defense

is one of recoupment, under the other pleas filed, and not one of set-off.

Under section 1 of article 8, an assignee of a chose in action, not negotiable, may, "by virtue of such assignment, maintain an action * * * in his own name against the debtor therein named in the same manner as the assignor might have done before the assignment," but it is provided in Section 3 of said article that "the defendant may make the same legal or equitable defences as might or could have been had and maintained against the assignor at the time of such assignment and before notice thereof, and to the same extent."

It was not the intention of the statute that either party to a contract should be deprived of his rights acquired thereunder by an assignment made by the other party thereto without his knowledge and consent; on the contrary, his rights so acquired are, by the statute, specially reserved to him in that he may make such legal or equitable defences against the assignee as he could have made against the assignor at the time of such assignment and before notice thereof, in a suit brought by the assignor.

As said by our predecessors in *Harwood v. Jones,* 10 G. & J. 420: "he who takes an assignment of a chose in action not negotiable, takes it subject to all the legal and equitable defences of the obligor or debtor, to which it was subject in the hands of the assignor. If he accepts the assignment in ignorance of their existence, without using the appropriate means of acquiring a knowledge of them, the consequences are the merited result of his negligence. It is his duty, if he wishes to avoid the effects of secret equities, to seek information from the obligor or debtor."

The appellee, plaintiff below, is engaged in the purchase of claims held by manufacturers, merchants and others, for goods, etc., sold and delivered to their customers. In the purchase of these accounts, a liberal allowance or discount is allowed the purchaser because of the risk incident thereto, and unless there is some change in the status of the claim, affecting its risk, the debtor is not ordinarily notified of the

assignment, and the assignor is thereafter permitted to proceed with the collection of the debt as if no assignment had been made. In all probability, the defendant in this case would not have been notified of the assignment had it not been for the growing financial weakness of the assignor, which was adjudicated a bankrupt within three days from the date of the assignment and notice thereof to the defendant. As disclosed by the evidence, the assignee, at the time of the assignment, knew of the financial difficulties of the assignor, but, as he said to the defendant, he thought it would pull through, but in this he was mistaken. In addition thereto, the assignee knew of the character of the dealings between the assignor and the defendant in respect to the transactions out of which the claims assigned arose.

Whether the defendant should have been allowed credits for losses resulting from defects in tires discovered after the assignment depends upon the question whether such defense could have been maintained against the assignor at the time of the assignment and before notice thereof, in an action brought by the assignor.

The assignor under the contract warranted the tires sold and delivered to be free of defects either in their construction or the material used, and necessarily such defects existed at the time of the sale and delivery of the goods, but the discovery of such defects could only be made after the sale and use of the tire. The defendant, as we gather from the record, had paid or settled for all tires sold and delivered to him, except those mentioned in the assigned invoices, and upon their assignment and the adjudication of the assignor a bankrupt, all dealings between the parties were practically closed, and it was from these invoices alone, that the defendant was to recoup his losses, and it is clear, we think, that a defense set up by him claiming allowance for all losses resulting from defects shown to exist at the time of the assignment and notice thereof, though not then discovered, could have been maintained against the assignor at such time in an action brought by the assignor.

The court, therefore, erred, we think, in granting the

plaintiff's prayers, otherwise stating the law applicable to this case.

The record contains four exceptions to the admission of evidence. The first is to the admission of a copy of the notice of the assignment sent by the assignee to the defendant. After its admission, the defendant admitted receiving the notice, of which the paper offered was a copy. Consequently the defendant was not harmed by its admission.

In an effort to show losses resulting from undiscovered defects in tires which, at the time of the trial below, had not been sold by the defendant, or if sold, not used for a distance sufficient to discover such defects, the defendant was asked "How many tires had you had manufactured for you by the Delion Company under this contract, upon which you have not as yet had an opportunity to ascertain whether or not they are defective in workmanship and materials?" The court's refusal to allow the defendant to answer this question constitutes the second exception.

This question was asked, as stated by the defendant's counsel, with the view of ascertaining the extent of defects existing in two thousand tires which the defendant still had on hand that he, under the contract, had purchased from the appellee's assignor, and as to which no opportunity had been afforded him to ascertain, by actual use, which, or how many of them, were defective within the meaning of the contract. The court, however, would not permit such inquiries to be made, holding that the evidence elicited thereby, as to the extent of the defects in those tires, would be vague and speculative, and not admissible.

The assignor of the plaintiff had been selling and delivering to the defendant, for a period of eighteen months, tires of like make and grade, and, as claimed by the defendant, the percentage of defects, which were chiefly defects of construction, was practically the same in each and all of the deliveries, varying but little in any of them, and during said period no effective change was made in the method of construction; and it is contended by the defendant, if such facts be shown, the defects in the tires still on hand and

unused may be ascertained with reasonable certainty by taking the average percentage of defects in those tires which were actually used and tried out. It was to develop this line of defense that the question objected to was asked, as a link in the chain of evidence essential to the development of such defense.

We agree with the appellant that upon such facts, if shown to exist, considered in connection with the facts hereinbefore stated, the extent of the defects in the unused tires may be so ascertained, it being the best evidence of which the nature of the case will permit, and in our opinion the court below erred in refusing to allow the question to be answered; and for the reasons already given in passing upon the court's rulings on the prayers, the court likewise erred in its rulings in the fourth and fifth exceptions.

For the errors pointed out, the judgment appealed from will be reversed.

> *Judgment reversed and new trial awarded,*
> *with costs to the appellant.*