## BANK OF UNITED STATES et al. v. CUTHBERTSON.

No. 3497.

Circuit Court of Appeals, Fourth Circuit.

Oct. 3, 1933.

Albert L. Cox, of Washington, D. C., for appellants.

William H. Bobbitt, of Charlotte, N. C. (Plummer Stewart, of Charlotte, N. C., on the brief), for appellee.

Before NORTHCOTT and SOPER, Circuit Judges, and WATKINS, District Judge.

SOPER, Circuit Judge.

The Bank of United States, a New York corporation, and Frank ' G. Crane, trustees under a trust indenture, executed to secure an issue of bonds of the Southeastern Hotels Company, a Florida corporation, in the sum of $675,000, filed a petition in the District Court in the bankruptcy proceedings of Charlotte Hotel Company, a North Carolina corporation, praying that its trustee in bankruptcy be required to deliver to the petitioners all the furniture, goods, and chattels contained in the premises known as the Hotel Charlotte in the city of Charlotte, N. C., or, in the alternative, that the trustee in bankruptcy be required to sell the said chattels subject to the lien of the chattel mortgage thereon. The chattel mortgage had been previously executed by Charlotte Hotel Company to secure the payment of bonds in the sum of $265,000, payable by it to the Southeastern Hotels Company, and both the bonds and the chattel mortgage had been deposited by Southeastern Hotels Company as collateral security for the payment of the bond issue of $675,000, above mentioned. This collateral, through certain assignments, had come into the hands of the petitioners who alleged that the bonds of the Charlotte Hotel Company were in default, and that there was due and owing upon them the sum of $193,896, with interest from May 1, 1931. The trustee in bankruptcy of Charlotte Hotel Company resisted the petition on the ground, amongst others, that the Southeastern Hotels Company, owning all the common stock of Charlotte Hotel Company, had caused the latter to issue the bonds in the sum of $265,000 without consideration, in order that they might be used to assist the Southeastern Hotels Company in paying the indebtedness of other hotel corporations owned or controlled by it; and that this bond issue was void in that it was prejudicial to the rights of the preferred stockholders and creditors of Charlotte Hotel Company. The case was referred to a special master, who heard the testimony and filed most careful and exhaustive findings of fact, and reached the conclusion of law that the petition should be dismissed. The district judge affirmed the findings and conclusions of the special master, and decreed that the petitioners' claim of $193,896 and interest be denied both as a secured and as an unsecured claim, and that the chattel mortgage of the Charlotte Hotel Company was void and of no effect, and that the trustee in bankruptcy owned the chattels therein described, free and clear of any claim of the petitioners. From this decree the petitioners appeal to this court.

The findings of the District Court, which are abundantly established by the evidence, disclose the following situation: Four individuals, namely, William Foor, E. E. Robinson, C. G. Wright, and A. M. Scales, were actively interested in a number of separate and distinct hotel corporations, and dominated and controlled their affairs, including Charlotte Hotel Company, operating the Charlotte Hotel at Charlotte, N. C.; Asheville Hotel Company, operating the George Vanderbilt Hotel at Asheville, N. C.; Francis Marion Corporation, operating the Francis Marion Hotel at Charleston, S. C.; and O'Henry Hotel Company, operating the O'Henry Hotel at Greensboro, N. C. They owned the entire common stock of the Charlotte Hotel Company, having a par value of $164,800; but the preferred stock, amounting to $85,200 in par value, had been sold to the public in Charlotte, and during the period when most of the transactions to be hereinafter discussed took place, a majority of the preferred stock was owned by citizens of Charlotte. They were paid dividends thereon until January, 1930, but had no voice in the management, because the charter provid-

ed that as long as the dividends were paid the preferred stockholders could not vote. When Charlotte Hotel Company went into bankruptcy, $37,300 of its preferred stock was held by persons who had no connection with the said transactions, and the bankrupt was indebted for rent to the owner of the hotel building leased by it in the sum of $39,532.73.

On February 11, 1924, Charlotte Hotel Company purchased from Albert Pick & Co., furnishings and equipment for the Hotel Charlotte for $234,828.56, of which it paid $93,931.42 in cash, and gave four notes, each for one-fourth of the balance of $140,897.14, payable thereafter at six month intervals, so that the last installment of $35,224.29 was due on April 1, 1926; and Charlotte Hotel Company executed a chattel mortgage on the merchandise as security for the debt. Each of the other hotels above mentioned separately purchased its furnishings and equipment from Albert Pick & Co. and became separately indebted in a substantial sum for the balance of the purchase price.

The hotels in this chain, except the Charlotte Hotel, found it difficult to meet the payments due Albert Pick & Co., and the individuals in control therefore incorporated Southeastern Hotels Company, as a holding company, and transferred to it the entire common stock of Charlotte Hotel Company, Francis Marion Corporation, and Asheville Hotel Company, and all but thirty shares of the common stock of O'Henry Hotel Company. The primary if not the sole purpose for the organization of the holding company was to join the four hotel corporations together in the execution of a financial plan under which the debt due Albert Pick & Co. could be paid. The four individuals named, together with J. G. Robertson, became the directors of Southeastern Hotels from and after November 1, 1926, and from this personnel were chosen the officers and directors of Southeastern Hotels Company and Charlotte Hotel Company. Hence these five men completely controlled and dominated the affairs of both corporations and made it possible to carry the plan into effect. The plan was actually devised and worked out by the attorneys of Albert Pick & Co., with whom negotiations were carried on from early in February, 1926, and their participation was so complete that Albert Pick & Co. had actual knowledge of the intercorporate relations and dealings between Charlotte Hotel Company, Southeastern Hotels Company, and the other corporations in the chain, both prior to and after the organization of the holding company.

In furtherance of the plan, Southeastern Hotels Company executed a trust indenture under date of November 1, 1926, to named trustees, in order to secure payment of its bonds aggregating $675,000, payable to bearer, and as collateral security for this issue, Southeastern Hotels Company assigned to the trustees bonds of the respective hotel corporations, secured by chattel mortgages, on the furniture in their respective buildings, including therein $265,000 of bonds issued by Charlotte Hotel Company to Southeastern Hotels Company secured by chattel mortgage on the chattels in the Hotel Charlotte, and also all of the lease rights of Charlotte Hotel Company and its entire issue of common capital stock. These bonds constitute the basis of the claim filed by the petitioners in the bankruptcy proceedings of Charlotte Hotel Company in the District Court. The chattel mortgage purported to cover all the furniture and fixtures owned by Charlotte Hotel Company, in order to secure the issue of ten bonds in varying sums from $12,000, to $84,000, aggregating the principal amount of $265,000, and payable at intervals of one year from November 1, 1927, to November 1, 1936, respectively. While the bonds and other documents involved in this transaction were dated November 1, 1926, the transfers were not completed until on or after December 30, 1926, when the delivery of the Southeastern bonds, the Charlotte bonds, and the other collateral was made to the representatives of Albert Pick & Co. in Chicago.

On or about January 27, 1928, Albert Pick & Co. entered into an agreement of sale and repurchase whereby it sold to the Bank of the United States at $92\frac{1}{2}$ all the outstanding bonds of Southeastern Hotels Company, issued under the trust indenture of November 1, 1926, for the sum of $607,536.24, upon the condition that the seller would repurchase the same in the event of a default in the payment of principal and interest thereon, and upon the further condition that a supplemental collateral trust indenture be executed providing for the substitution of the petitioners as trustees in place of the trustees named in the original trust indenture. Such a supplemental trust indenture was accordingly executed under date of February 25, 1928, and the purchase was made. Pursuant to the purchase, the underlying collateral, including the bonds of the Charlotte Hotel Company, was delivered to the new trustees.

Albert Pick & Co. purchased the bonds of Southeastern Hotels Company in 1926 at 85, and in consideration of these bonds, it

canceled the outstanding indebtedness of the four corporations to it for merchandise, and also an indebtedness of the Southeastern Hotels Company and O'Henry Hotel Company for cash advances. At that time the indebtedness of Charlotte Hotel Company to Albert Pick & Co. for furniture and equipment was in arrears, and the effect of the substitution of the new chattel mortgage for $265,000 was an extension of the pre-existing indebtedness; but this indebtedness, including therein a so-called service charge of $15,360.35 for a previous extension, amounted to only $154,255.40 on November 1, 1926, whereas the bonds of Charlotte Hotel Company, which came into the possession of Albert Pick & Co., amounted to $265,000. Moreover, the individuals controlling its affairs had caused Charlotte Hotel Company without benefit to itself, to lend to them and to Southeastern Hotels Company, large sums of money that were due and owing to Charlotte Hotel Company when it issued the bonds in question. It was the practice of the individuals in control to transfer moneys from one hotel corporation to another, as the needs of the several independent corporations required; and on the records of each corporation there appeared an account known as Foor and Robinson Hotels, which represented these money transactions. The result was, that on December 31, 1926, when the transaction with Albert Pick & Co. was consummated, Foor and Robinson Hotels were indebted to Charlotte Hotel Company for actual cash advances of $123,667.96 made prior to July 1, 1926, and Southeastern Hotels Company was similarly indebted in the sum of $119,713.80 for advances made between July 1 and December 31, 1926. These two amounts were much more than sufficient to pay all indebtedness of Charlotte Hotel Company to Albert Pick & Co., but nevertheless they were not so used. On the contrary, the apparent indebtedness of the Hotel Company was actually increased by the new issue of bonds. Furthermore, during the period from 1928 to 1931, direct cash payments, without consideration, were made by Charlotte Hotel Company to Southeastern Hotels Company in excess of $400,000. Albert Pick & Co. had actual knowledge of all these payments.

The manner in which the affairs of Charlotte Hotel Company were conducted for the personal benefit of the four individuals in control is illustrated by the cancellation, without consideration, of subscriptions to 675 shares at par of the common stock of the corporation which they had previously made. This action was taken on February 20, 1926, upon the suggestion of attorneys of Albert Pick & Co., when negotiations looking toward the bond issue of Southeastern Hotels Company had already begun. Subsequently, on January 10, 1929, the same individuals caused Charlotte Hotel Company to purchase 4,000 shares of the preferred stock of Southeastern Hotels Company for $400,000, in order to offset the advances of cash previously made, although this preferred stock had no value; and on July 10, 1930, a similar purchase of an additional 500 shares of the preferred stock for $50,000 was made for the same purpose.

The Southeastern Hotels Company made divers payments on its bond issue of $675,000 to the trustees under its bond mortgage out of payments which it received from its subsidiaries, including Charlotte Hotel Company. These payments were made until March, 1931, and entries were made on the books whereby a credit was given to Charlotte Hotel Company in the proportion that the amount of its bonds, $265,000, bore to the amount of the issue of the Southeastern Hotels Company of $675,000. On May 1, 1931, these entries indicated that the apparent indebtedness of Charlotte Hotel Company on its bond of $265,000 had been paid to the extent of $71,104, but in fact, as we have seen, Charlotte Hotel Company had made advances to Southeastern Hotels Company in excess of $400,000, notice of which had been brought home to the trustees under the trust indenture of Southeastern Hotels Company by financial statements of Charlotte Hotel Company furnished to it annually. The amount of the petitioners' claim in bankruptcy, as we have seen, was $193,896, representing the balance due upon the bonds of $265,000, with interest, after making the above credit of $71,104.

It is clear from this recital that the findings of the District Court were abundantly established to the effect that the execution and delivery by Charlotte Hotel Company of its bonds in the sum of $265,000 to Southeastern Hotels Company was against the interest of Charlotte Hotel Company and constituted a fraud on it and upon its preferred stockholders and upon its existing and future creditors. When the fairness of transactions between corporations having common directors is challenged, the burden is upon those who would maintain them to show their entire fairness. Finefrock v. Kenova Mine Car Co. (C. C. A.) 22 F.(2d) 627, 632; General Finance Corp. v. Keystone Credit Corp. (C. C. A.) 50 F.(2d) 872. In the pending case, not only has there been a failure to meet this burden,

but the evidence established beyond any reasonable doubt that the bonds of the Charlotte Hotel Company were issued without consideration for the benefit of those in control of its affairs, and that Albert Pick & Co., into whose hands they came as collateral for a larger indebtedness, had full knowledge of the facts. When the Charlotte Hotel Company went into bankruptcy in November, 1931, it became the duty of its trustee to inquire into the nature of the bankrupt's business, and particularly into the validity of the bonds and the chattel mortgage securing them. It is obvious without further discussion, that so far as Southeastern Hotels and Albert Pick & Co. are concerned, the bonds do not represent valid obligations of the bankrupt in the hands of a holder in due course, but were rightfully declared to have been issued in fraud of the corporation and to be therefore void and of no effect.

■■ The bonds of Charlotte Hotel Company, however, are no longer held by the trustees under the original trust indenture as collateral security for the payment of the bonds of Southeastern Hotels Company, in the hands of Albert Pick & Co. The latter bonds have been sold to the Bank of United States and the former are held as collateral security therefor by the new trustees, namely, the petitioners in the District Court, who sought therein to sell the bonds for the benefit of the Bank of United States, the present holder of the principal indebtedness. The question remains whether the new holders stand in any better position than the old. In the District Court the petitioning trustees conceded that the bonds of Charlotte Hotel Company were not negotiable, and it was accordingly held that the present holders are merely assignees of the bonds, in no better position than the original holder. That holder, as we have seen, was the Southeastern Hotels Company, who assigned them with the chattel mortgage to the trustees under the original trust indenture, and they in turn assigned the bonds to the new trustees under the supplemental trust indenture in furtherance of the sale by Albert Pick & Co. to the Bank of United States. It follows that if the bonds were not negotiable, both sets of trustees held them subject to the same defenses of fraud and absence of consideration as would have been available to the bankrupt estate, if the bonds had remained in the hands of the original holder. See sections 58 and 28 of the Negotiable Instruments Act, 5 U. L. A. pp. 395, 189.

The petitioners-appellants now say that the concession of nonnegotiability in the District Court was improvidently made, and that the bonds were in fact negotiable by reason of certain provisions which they contained. Each of the bonds contained a promise to "pay to Southeastern Hotels Company" a definite sum of money on a definite date, and concluded with the following paragraph: "The provisions of this bond and of said chattel mortgage by which it is secured shall inure to the benefit of and shall be binding upon the successors and assigns of Charlotte Hotel Company and Southeastern Hotels Company, including the holders of the bonds of this issue and of the interest coupons."

The Negotiable Instruments Act is in force both in North Carolina, where the bonds were delivered to Southeastern Hotels Company, and in Illinois, where they were delivered by Southeastern Hotels Company to the original trustees (see Consolidated Statutes of North Carolina, § 2982 et seq.; Smith-Hurd Rev. St. Ill. 1933, ch. 98, § 21 et seq.). It is quite generally held that corporate bonds are within the purview of the act, 5 U. L. A. § 1, p. 19, note. It provides in section 1, 5 U. L. A. p. 7 that an instrument to be negotiable must, amongst other requirements, be payable to order or to bearer. The bonds of Charlotte Hotel Company were not payable to order or to bearer, but to a named person, Southeastern Hotels Company. Nevertheless it is contended that, as was the case under the law merchant, County of Wilson v. National Bank, 103 U. S. 770, 776, 26 L. Ed. 488, the provisions of the act need not be literally complied with in order to make an instrument negotiable, if it contains other provisions which indicate an intent of the parties that it shall be negotiable; and it is said that the concluding paragraph of the bonds, above quoted, by its reference to the successors and assigns of the parties to the bond, and to subsequent holders thereof, indicates that it was the purpose of the parties to make the bonds negotiable. We do not think that the quoted words can be given this effect. The bonds were expressly made payable to a named person and such a provision clearly imports a lack of negotiability. The effect of it is not overcome by the terms of the closing paragraph. Indeed the two provisions are quite consistent with one another; the former indicating the nonnegotiability, and the latter the assignability of the instrument. Mackin v. Blalock, 133 Ga. 550, 66 S. E. 265, 134 Am. St. Rep. 220; Wettlaufer v. Baxter, 137 Ky. 362, 125 S. W. 741, 26 L. R. A. (N. S.) 804. The absence of the words "to bearer" or "to

order" does not render the bonds nonassignable, while the language making them binding on the parties and their assigns is of the sort which is generally construed to indicate assignability, an attribute of every contract to pay money in the absence of terms manifesting a contrary intention. Delaware County v. Diebold Safe Co., 133 U. S. 473, 488, 10 S. Ct. 399, 33 L. Ed. 674; Atlantic & N. C. R. Co. v. Atlantic & N. C. Co., 147 N. C. 368, 61 S. E. 185, 23 L. R. A. (N. S.) 223, 125 Am. St. Rep. 550, 15 Ann. Cas. 363. In short, the bonds were intended to be assignable but nonnegotiable, and, being void in the hands of the original holders, are also void in the hands of the petitioners in the District Court.

The decree of the District Court is affirmed.