## FIRST NAT. BANK OF BINGHAMTON, N. Y., v. MAYOR AND CITY COUNCIL OF BALTIMORE.

### No. 27.

District Court, D. Maryland.
April 25, 1939.

446

Edgar Allan Poe (of Bartlett, Poe & Claggett), of Baltimore, Md., and Hinman, Howard & Kattell, of Binghamton, N.Y., for plaintiff.

Chas. C. G. Evans, City Sol., Allen A. Davis, Asst. City Sol., Walter L. Clark, and Roszel C. Thomsen, all of Baltimore, Md., for defendant.

CHESNUT, District Judge.

In this non-jury law suit the First National Bank of Binghamton, New York, is suing Baltimore City to recover the principal payable May 1, 1933 upon two certificates of so-called Baltimore City

"Stock", each for the sum of $5,000, with unpaid interest thereon from November 1, 1926. Although currently called "stock" the certificates are really promissory notes under seal. Both were issued October 6, 1925, and recited indebtedness to L. F. Rothschild & Co. Each of the certificates contains on the back a printed simple form of assignment which at the bottom bears the signature of L. F. Rothschild & Co. who are stock brokers in New York City. The plaintiff asserts that it is the holder in due course for value of both certificates; but the City denies liability because of equities in its favor arising before notice to it of the assignment; and also denies that the plaintiff has good title to the certificates.

From the testimony submitted at the trial of the case I find the following facts. Both certificates were issued in due course for value by the City to L. F. Rothschild & Co. on October 6, 1925. Before December 17, 1925 Rothschild & Co. sold and delivered the certificates for value to Redmond & Co., also brokers of New York City. At that time Rothschild signed or endorsed the certificates in blank. Thereafter on or about December 17, 1925, Redmond & Co. re-sold said certificates and delivered them in the same form back to Rothschild & Co.

The delivery was made in the following way. The office of Redmond & Co. in New York City was only a short distance from the office of Rothschild & Co. The latter was situated on the fifth floor of the Equitable Trust Building, 120 Broadway, New York City. The duly constituted agent of Redmond & Co. called the Wall Street Messenger Service for a messenger to make the delivery. The messenger sent was a sixteen-year old boy who at the time was attending high school in Brooklyn, but acting as a messenger in the afternoons. His name was Daniel Lame. He is now thirty years of age, and at the trial testified positively and definitely as to the circumstances of making the delivery. He said that on receiving the certificates from Redmond & Co. with instructions as to the delivery, he took them at once to the office of Rothschild & Co., entered the outer door to the office before three P. M., and pushed the certificates through a receiving slot in the partition in the inner office marked for "delivery" of securities, and called out at the time "delivery". He did not ask for or receive a receipt for the delivery then made which consisted of the two certificates sued on and others of a similar nature aggregating $40,000 of principal. He then left the office of Rothschild & Co. to attend to some other business but returned in less than an hour to get the check from Rothschild & Co. for Redmond & Co. in payment for the certificates; but on asking for it in the usual way he was told that the delivery had not been received. He insisted that it had been made, and thereupon the cashier of Rothschild & Co. called the office of Redmond & Co. and in a few minutes the adjuster of the National Surety Co., the insurer of Redmond & Co. with respect to security losses, and two detectives came to the office of Rothschild & Co. and made a very thorough search of the immediate premises and of the clerks of Rothschild & Co. who presumably might have had access to the securities, but without success in finding them. The messenger Lame was detained and very thoroughly questioned for several hours but no charges were ever preferred against him. He subsequently studied law and has not been directly impeached or contradicted in any way as a witness. Lame's testimony, corroborated in this respect by other witnesses, was to the effect that in the very busy securities and exchange business prevailing in the Wall Street district in New York in 1925 and 1926, it was very customary to make deliveries of securities in the loose and informal way which he described. Some brokerage firms required at least informal receipts but possibly so many as forty per cent. of them did not, and made deliveries in the general way described by the witness.

Redmond & Co. or Rothschild & Co. immediately by telegram and letter advised the office of the City Register of Baltimore City that the certificates in the amount of $40,000, giving their numbers, had been lost or stolen and the certificates if presented for transfer should not be transferred. Local ordinances of Baltimore City, provide in substance that upon the reported loss of certificates for Baltimore City stock the City may properly, after affidavit and advertised publication of the loss and the expiration of the period of sixty days, issue new certificates in place thereof with or without the delivery of an indemnity bond. In accordance with this statute the loss of the certificates was duly advertised and on May

17, 1926 the City, after taking an indemnity bond, issued three new certificates, each for $5,000, payable to L. F. Rothschild & Co., which certificates thereafter were transferred on the books of the City to other holders and the current semi-annual interest accruing thereon was paid up to and including the maturity date of May 1, 1933, when the principal was then paid to the then holders. The other missing certificates were recovered.

In the meantime on February 8, 1926, one Cronemeyer, then apparently a man engaged in a substantial business and a property owner living near Binghamton, N. Y., personally known to the cashier of the First National Bank of Binghamton, applied to the latter for a loan of $8,000 on the security of the two Baltimore City certificates here sued on. The bank made the loan and took the certificates in the form above described as security for a sixty-day note for $8,000. On May 24, 1926 Cronemeyer obtained an additional loan of $20,000 from the bank, merging the new loan with the old, and giving a note for $28,000 and pledging as additional collateral $24,000 Buffalo General Electric Bonds represented by interim receipts therefor in favor of the bearer. When the latter note matured but was not paid, the Bank placed the whole collateral in the hands of a broker for sale, but was unable to effect it because delivery was refused by the purchaser on the ground that it was claimed the securities had been stolen. It was said that Cronemeyer shortly went into bankruptcy.

It developed at the trial that the circumstances affecting the title to the $24,000 Buffalo General Electric interim receipts were as follows. Before their possession by Cronemeyer these securities were in the possession of Rothschild & Co. who had bought them from another broker. Delivery had been made prior to the stated time therefor, and upon demand for payment by the vendor, Rothschild & Co., acting by its receiving and delivery clerk, one Arthur T. Krisch (now deceased) declined to make payment but offered to return the bonds temporarily. Shortly thereafter a person appearing to be a messenger called at Rothschild & Co.'s office and received the securities from Krisch; but they never were in fact returned to the vendor; and nothing was known as to their subsequent possession until they were pledged by Cronemeyer with the bank.

Rothschild & Co. brought suit in New York against the Bank for the recovery of these interim receipts for bonds and prevailed in the suit. Rothschild & Co. v. First National Bank of Binghamton, 140 Misc. 499, 251 N.Y.S. 25, affirmed without opinion by the Appellate Division, 237 App.Div. 808, 260 N.Y.S. 974, also affirmed without opinion by the Court of Appeals of New York, 262 N.Y. 559, 188 N.E. 63.

The $40,000 par value of Baltimore City stock above referred to was represented by six different certificates, two for $10,000 each and four for $5,000 each. Shortly after their loss on December 17, 1925, the adjuster for the National Surety Company succeeded in recovering three of the certificates aggregating $25,000 par value, from a member of the "underworld", as he put it, but without the particular circumstances thereof appearing in the testimony. The remaining certificates were numbered 639, 640 and 642, the two here sued on being numbered 639 and 640. As already stated the City issued new certificates therefor in the name of Rothschild & Co. on May 17, 1926, the new certificates being numbered 751, 752 and 753, each for $5,000 of principal. These certificates were duly assigned by Rothschild & Co. and delivered to the National Surety Company who had paid the loss of Redmond & Co. On August 2, 1926 certificate No. 753 was duly transferred on the books of the City Register of Baltimore City to the Jackson Lumber Co.; and on August 12, certificates Nos. 751 and 752 were likewise duly transferred to Curtis L. Burnam; and the City thereafter paid the interest thereon to the registered holders from time to time and paid the principal thereof at maturity on May 1, 1933.

Nothing was learned by Rothschild & Co. or Redmond & Co. or the adjuster of the National Surety Company of the whereabouts of certificates Nos. 639, 640 and 642, until the early part of August 1926, when for the first time the adjuster learned from a Mr. Clark, attorney of Binghamton, New York, for the Bank, that it held these certificates. Certificate No. 642 has never been located.

The City received no notice of any kind from any one as to the existence or possession of certificates Nos. 639 and 640 until some time in August 1926 when, according to the testimony of Mr. Clark, he came to Baltimore and presented the certificates in

their present form at the office of the City Register for transfer which he said was refused. I am unable to find as a fact from Mr. Clark's testimony that his notice to the City was given prior to August 12, 1926 when certificates Nos. 751 and 752, which had been issued by the City presumably in substitution for Nos. 639, and 640, were transferred from the name of Rothschild & Co. to Curtis L. Burnam, if that date be material or important in the case. While I accept the fact that Mr. Clark did at some time present the certificates to the Baltimore City Register for transfer, the circumstances as appearing in his testimony are not sufficient to fix the date definitely, and the informality of the transaction as narrated by him was such that his recollection of the details was not impressive. He testified from memory only after twelve years. He made no written demand for the transfer either prior or subsequent thereto; nor did his client, the Bank, ever communicate in writing or otherwise than by Mr. Clark's rather informal demand with the City upon the subject until 1929. The Deputy City Register at that time, Mr. Lyons, is now dead, and the then acting transfer clerk, a Mr. Murphy, is no longer in the City's employ, and his present residence is unknown. Mr. Clark was himself unknown to any person in the City Register's office. His testimony was merely that being in the City for another matter and having been requested by one of his law partners to do so, he took the certificates to the office of the City Register, spoke to some one behind the grill, handed him the certificates with a memorandum for transfer to the First National Bank of Binghamton, written on Mr. Clark's personal card, and asked that they be transferred; and that the clerk to whom he spoke went into another room with the certificates and he or another clerk came back shortly thereafter and said the transfer was declined or refused. Nothing further transpired in the way of explanation either by Mr. Clark or by the clerk and no written record was made of the demand. The office of the City Register, after a diligent search, is unable to find Mr. Clark's card or any reference whatever in the way of memorandum or otherwise of his visit and demand, although it does have an otherwise apparently complete file of correspondence with regard to the lost stock certificates and the issue of new certificates therefor.

The Bank took no further action whatever with regard to the certificates until in 1929 when it brought a suit in the State Court in Baltimore City for interest due up to that time on the certificates. The defendant City demurred to the one special count in the declaration and the suit never progressed further than this demurrer. In due course in about two years the suit was dismissed for want of prosecution. Thereafter the Bank took no further action until it instituted the present suit in this court on October 25, 1938.

An interest payment was due on certificates Nos. 639 and 640 on May 1, 1926. No demand was made on the City for the payment of this interest by the Bank at that time, and the Bank did not claim that interest payment when it brought its suit in 1929. The new certificates were not issued by the City until more than two weeks thereafter on May 17, 1926, at or about which time it also paid the semi-annual interest due May 1st to Rothschild & Co.

There was no testimony as to how Cronemeyer obtained possession of the certificates. Nor was there any direct testimony as to how the certificates were removed from the possession of Rothschild & Co.; but the reasonable inference from all the testimony in this respect was that they had been stolen or otherwise wrongfully misappropriated by some one in the employ of Rothschild & Co. While the practice pursued by the messenger Lame in making delivery without obtaining a receipt was certainly very loose, I accept his unimpeached testimony that he did make the delivery in the way above mentioned. The delivery slot in the office partition through which he put the certificates communicated directly with a receiving basket on the inner side of the partition, that is, within the cage of the receiving clerk. It is also significant, and seemingly more than a mere coincidence, that some of the Baltimore City stock certificates, as well as the Buffalo General Electric interim receipts for bonds, which latter admittedly were in the possession of Rothschild & Co., came to the possession of Cronemeyer and were pledged by him with the Bank. It is suggested that a finding that the messenger Lame made the delivery to Rothschild & Co. is inconsistent with the action of Redmond & Co. and Rothschild & Co. in treating the loss of the Baltimore City certificates as the loss of Redmond & Co. rather than that of Rothschild & Co. But it is to be noted that both Redmond & Co. and Rothschild

& Co. were insured against security losses by the National Surety Company which paid the loss to Redmond & Co.; and Baltimore City treated the loss as that of Rothschild & Co. in the issuance of the new certificates to them. As both brokerage firms were insured by the same surety company and as Rothschild & Co. did not pay Redmond & Co. for the securities, it was seemingly unimportant between them which firm was treated as the loser for the payment of loss by the surety company, especially as by arrangement between the two firms the new certificates when issued were assigned over to the National Surety Company. It may also be observed that very probably the fact that both firms were insured against security losses largely explains the loose method of deliveries illustrated in this case.

No facts were presented by the Bank to explain or excuse its delay in the pursuit of its rights as now claimed. In this respect it relies only on the position that the certificates are under seal and asserts the applicable period of limitations is twelve years, Md.Code, Art. 57, § 3, from the maturity of the principal of the notes, May 1, 1933.

On these facts it is the contention of the Bank that it became the holder for value in good faith of the certificates sued on. The Bank claims title to the certificates as against Redmond & Co. and Rothschild & Co. *by estoppel.* It also claims that it was entitled to have the certificates transferred to it when they were presented some time in August 1926; and that at that time there were no equities existing in favor of the City as against Rothschild & Co. superior to the claim of the Bank.

The City contends (1) that the plaintiff acquired no valid title to the certificates under the circumstances; (2) that even if the Bank did acquire a good title as against Redmond & Co. and Rothschild & Co. there were superior equities in favor of the City against Rothschild & Co. which had accrued before the City received notice of the plaintiff's claim; and (3) that the plaintiff's claim is anyhow barred by limitations and laches.

Preliminary to a consideration of these contentions it is necessary to determine the legal characteristics of the certificates sued on, with particular respect to their negotiability. This so-called City stock has been customarily issued by Baltimore City for at least fifty years; and it is therefore somewhat surprising that there seems to be no Maryland decision regarding its negotiability. The uniform negotiable instrument act has been in force in Maryland since 1898, see Md. Code, Art. 13, § 13, et seq. It has also long been in force in New York. Its provisions include bonds, it is very uniformly held. 5 U.L.A. § 1; p. 19, Note. Whether tested by the negotiable instruments act or the prior law of merchants, it is clear on principle that the certificates are not negotiable. In form they constitute certificates of indebtedness to a named person and a promise to pay a definite sum of money on a definite date, with interest thereon payable semiannually on stated dates. They are not payable to the holder or his order, nor to him or bearer, nor even expressly to him and his assignees. The certificates also contain the legend that they are transferrable only on the books of the City by the holder in person or by attorney.[1]

---

[1] The full form of the certificate reads as follows:

"City of Baltimore
United States of America

"$15,000,000                    Authorized
"No. 639                              $5,000
"This certificate is        Exempt from
one of a series        federal income tax
which matures      and all taxes within the State of
May 1, 1933                        Maryland
"Four Per Cent                Stock of the
City of Baltimore
"Interest payable
"May 1st and November 1st Series 1933
"State of Maryland
"Second School Serial 1924–1948 Loan
"This is to Certify that the Corporation of the Mayor and City Council of

Baltimore is indebted to L. F. Rothschild & Co. in the sum of — Five Thousand — Dollars due and payable on the first day of May in the year of 1933, upon the presentation and surrender of this certificate with interest thereon until due at the rate of Four Per Centum per annum, payable semi-yearly on the first days of May and November in each and every year. This certificate is only transferable at the office of the City Register of Baltimore in person or by Attorney, and upon surrender of this Certificate.

"In Testimony Whereof, and by virtue of Ordinance No. 748 of the Mayor and City Council of Baltimore approved July 28th, 1922, which provides for the issuance of the registered stock of the Mayor and City Council of Baltimore to an

451

As the certificates are not made payable "to order or to bearer", and contain no similar or equivalent words indicating an intention to make them negotiable, they are not negotiable instruments (Md.Code, Art. 13, §§ 20, 29); Citizens' Nat. Bank v. Custis, 153 Md. 235, 244, 138 A. 261, 53 A.L.R. 1165. In common with other choses in action for the payment of money they are assignable, but not negotiable. Interest payments are made by the City by check payable to the named holder. The certificates do not carry coupons for the interest payments. In legal nature and effect the so-called City stock is really a fully registered bond.[2] Similar bonds, of an ordinary corporation, were held to be assignable but not negotiable in an opinion by Judge Soper for the Circuit Court of Appeals for this Circuit in Bank of United States v. Cuthbertson, 67 F.2d 182, 187.

The plaintiff submitted the testimony of a stock broker in Baltimore City to the effect that in customary practice City stock in this form when assigned on the back in blank was accepted as a good delivery by stockbrokers. But the testimony fell short of proving that the certificates were by local usage treated as fully negotiable. The testimony referred to must be considered in connection with the testimony of the present deputy City Register with regard to the practice of the City in making transfers. Although the certificates provide that they are transferable only on the books of the City in person or by attorney, the practice of the City is to make a transfer when the certificate is presented and the transfer is requested by a known reputable broker and the genuineness of the signature of the holder is properly guaranteed. In other words, in such cases the City

amount not exceeding Fifteen Million Dollars, for the purpose of defraying the cost and expenses of the acquisition of school house sites and the construction of school buildings and additions to and reconstruction of existing school buildings of the City of Baltimore, as authorized by Chapter 379 of the Acts of the General Assembly of Maryland, passed at the January Session in the year 1922, and which ordinance was ratified by the legal voters of the City of Baltimore at an election held on November 7th, 1922, I, the Mayor, have hereto set my hand and affixed the Seal of the Corporation, this 6th day of October, 1925.
"Countersigned and recorded by
"F. A. Dolfield
"City Register    Howard W. Jackson
                                    Mayor."
On the back of the certificate is a printed legend as follows:
"For Value Received ———— hereby assigns the within Certificate to ————

"Witness:
"————    ————[Seal.]"

[2] The nature and characteristics of a registered municipal bond of this kind is clearly described in McQuillin on Municipal Corporations, 2nd Ed. Revised Vol. 6, s. 2424, as follows: "A registered bond is one which is a simple certificate of indebtedness, in favor of a particular individual, payable at a named date with interest at days specified. The name of the payee is entered on the books of the municipality as the registered owner. On the days when, by the terms of the bond, the interest falls due, it is paid directly to the registered credi-

tor, without presentation of the bond,—usually by check drawn to his order and sent by mail, or, if he so demands, by cash in hand; but, by long-settled course of practice, the payment is made by check to the order of the creditor. The bonds are not negotiable, and can be transferred only by an entry on the books of the debtor corporation, with a proper indorsement on the bond itself, or by the issue of a new certificate, if it be a government indebtedness. The peculiar value of this class of securities lies in the fact that it is not necessary to produce them to the debtor, at each time that the interest is due, and the danger of loss by robbery or fire is entirely removed. As they are usually made to run for a long term of years, so that the amount of the interest in the aggregate is really greater than the principal, this peculiarity is of great importance."
That registered bonds in this form are not negotiable, see also Quindry, Bonds and Bondholders, Vol. 1, s. 15, and Benwell v. Mayor of City of Newark, 55 N.J.Eq. 260, 36 A. 668; Enoch v. Brandon, 249 N.Y. 263, 266, 164 N.E. 45; State Bank v. Central Mercantile Bank, 248 N.Y. 428, 162 N.E. 475, 59 A.L.R. 1473; Harr v. Market St. Title & Trust Co., 326 Pa. 410, 190 A. 903; Scollans v. Rollins, 179 Mass. 346, 60 N.E. 983, 88 Am.St.Rep. 386; Id., 173 Mass. 275, 53 N.E. 863, 73 Am.St.Rep. 284; Zander v. New York Sec. & Trust Co., 178 N.Y. 208, 70 N.E. 449, 102 Am.St.Rep. 492; Novoprutsky v. Morris Plan Co. of Philadelphia, 319 Pa. 97, 179 A. 218, 98 A.L.R. 1486; Cronin v. Patrick Co., C.C., 89 F. 79; 3 Thompson Corporations, s. 2344.

waives the requirement that the holder appear in person or by attorney to have the transfer made. Not only was the testimony insufficient to show full negotiability by custom but so far as the City is concerned it is not permissible to convert its legally non-negotiable instrument into a negotiable one merely by evidence of custom as to negotiability. First Nat. Bank v. Taliafero, 72 Md. 164, 19 A. 364; Manhatton Co. v. Morgan, 242 N.Y. 38, 150 N.E. 594; Enoch v. Brandon, 249 N.Y. 263, 164 N.E. 45; Fletcher on Corporations, s. 2701; Kohn v. Sacramento Elec., Gas & R. Co., 168 Cal. 1, 141 P. 626, 628; King Cattle Co. v. Joseph, 158 Minn. 481, 199 N.W. 437; Rothschild v. First Nat. Bank of Binghamton, 140 Misc. 499, 251 N.Y.S. 25. See Federal Reserve Bank v. Malloy, 264 U. S. 160, 171, 44 S.Ct. 296, 68 L.Ed. 617, 31 A.L.R. 1261.

■ *Plaintiff's title:* We must therefore approach the consideration of the question as to whether the plaintiff got a good title in the light of the legal non-negotiability of the certificates, and the general rule that an assignee of a non-negotiable instrument takes it subject to equities. The equities of the debtor will always prevail, unless he is estopped; but equities in favor of third parties (sometimes called "latent equities") do not defeat the assignee, in the absence of notice, according to the apparent weight of authority. 4 Am.Jur. p. 316, s. 110; 6 C.J.S., Assignments, p. 1167, § 118.

■ The plaintiff claims title from Redmond & Co. or Rothschild & Co., one or the other or both, *by estoppel.* The doctrine of acquisition of title by estoppel against the true owner, relied on here by the plaintiff Bank, is based on the intrusting of property by an owner to his agent, and clothing him with indicia of ownership, from which a bona fide purchaser is justified in believing the agent to be authorized to sell or otherwise dispose of the property. It has long been applied in the case of ordinary corporation stock certificates, which are said to be quasi-negotiable. First Nat. Bank v. Lanier, 11 Wall. 369, 20 L.Ed. 172; National Safe Deposit, Savings & Trust Co. v. Hibbs, 229 U.S. 391, 33 S.Ct. 818, 57 L.Ed. 1241. And the Uniform Stock Transfer Act has fully confirmed the judicial decisions. The decisions were based in part on the consideration that the stock certificates were instruments of commerce in practice freely passing from hand to hand, and in part on the language of the customary form of assignment on the back of the certificate which contained the written authority of the holder named in the certificate to have it transferred on the books of the corporation. But prior to the Uniform Act it was generally held that if the certificate had been stolen, the bona fide purchaser would not get good title, unless the owner had been negligent. 52 A. L.R. 949; Western Union Telegraph Co. v. Davenport, 97 U.S. 369, 24 L.Ed. 1047. In the Hibbs case the opinion of the court quoted with approval from an opinion by Mr. Justice Holmes in Russell v. American Bell Tel. Co., 180 Mass. 467, 62 N.E. 751, where the doctrine of title by estoppel was clearly stated: "The qualification of the rule, as not applying when the instrument is stolen, is not based upon the name of the agent's crime, but upon the fact that, in the ordinary and typical case of theft, the owner has not intrusted the agent with the document, and therefore is not considered to have done enough to be estopped as against a purchaser in good faith. He certainly has not done enough if the estoppel is based upon the principle that when one of two innocent persons is to suffer, the sufferer should be the one whose confidence put into the hands of the wrongdoer the means of doing the wrong. But in a case like the present, the agent has been intrusted with the converted property, and it is totally immaterial whether, by a stretch which extends larceny beyond the true field of trespass, his wrong has been brought within the criminal law or not. The ground of the estoppel is present and the estoppel arises. The distinction is not new. On the one side are cases like Knox v. Eden Musee Americain Co., 148 N.Y. 441, 42 N.E. 988, 31 L.R.A. 779, 51 Am. St.Rep. 700, where an agent or servant simply had access to a document remaining in the possession of the owner; on the other, cases like Pennsylvania Railroad's Appeal, 86 Pa. 80, where possession is intrusted to the agent for one purpose and he uses it for another. It cannot matter in the latter class that the agent intended the fraud from the outset." [229 U.S. 391, 33 S.Ct. 820.]

■ Whether the estoppel doctrine, apart from statute, is generally applicable to non-negotiable instruments (other than stock certificates) is a matter of dispute on the authorities. There are decided cases which have applied the doctrine to so-call-

ed quasi-negotiable instruments other than stock certificates. In Scollans v. Rollins, 179 Mass. 346, 60 N.E. 983, 88 Am.St.Rep. 386 (see, also, former appeal 173 Mass. 275, 53 N.E. 863, 73 Am.St.Rep. 284) Justice Holmes apparently treated a registered city bond (called stock) when endorsed in blank subject to the doctrine, but the majority of the court found no intrusting by the owner on the facts. Mr. Pomeroy, in his Equity Jurisprudence, Vol. 2 (4th Ed.) ss. 710, 711, pp. 1434–1444, after full discussion of the principle and the decided cases, concludes very clearly that the doctrine is not so applicable, as it would obliterate the distinction between negotiable and non-negotiable instruments. He considers Moore v. Metropolitan Nat. Bank, 55 N.Y. 41, 46, 49, 14 Am.Rep. 173 (a case favorable to the application of the doctrine) to have been in effect overruled by later New York cases. Some commentators have criticized Pomeroy's conclusion, and it appears to be contrary to the weight of authority. See New York Life Ins. Co. v. Brown, 4 Cir., 99 F.2d 199, 202; 8 Minn.Law Review, 526; 14 Cornell Law Quarterly, 347; 6 Minn.Law Review, 96; Williston, Contracts, s. 438; Restatement, Contracts, s. 174. But the considerations which have induced the judicial decisions that ordinary stock certificates, although only quasi-negotiable, are within the scope of the doctrine of title by estoppel, apply with less force to certificates such as are here involved, which are really registered bonds. They are not instruments of commerce to anything like the same extent as stock certificates, but are used much more as permanent or long time investments. Furthermore, the ordinary method of transferring a registered bond when sold by the holder is to accompany it with a written assignment which includes a power of attorney to have a transfer made on the books of the issuing corporation. See Patapsco Nat. Bank v. Meads, 131 Md. 573, 578, 102 A. 993. The assignment in blank endorsed on the back of the certificates in suit does not include such a power of attorney for transfer. And the certificates on their face notify the holder or purchaser that they are transferable only on the books of the City. Again, the very purpose of registering a bond is to restrict the facility of its transfer and to further protect the ownership of the registered holder. For these reasons, in my opinion, the better view is that the doctrine of es-

toppel should be applied to registered bonds with much more caution than with respect to stock certificates. See Commercial Nat. Bank of Washington, D. C., v. Shriver, 4 Cir., 275 F. 12, 14. It is more consistent with the purposes of bond registration to treat a mere assignment in blank *without a power of attorney,* where the face of the instrument states that it is transferable only on the books of the issuing corporation, as insufficient indicia of ownership to make it pass from hand to hand merely by delivery without inquiry.

Since Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, the case must be determined here on the Maryland law. But, as the transaction by which the Bank obtained the certificates occurred in the State of New York, the Maryland decisions hold that the New York law determines the effect of that transaction. Mylander v. Page, 162 Md. 255, 265, 159 A. 770; Kerr v. Urie, 86 Md. 72, 76, 37 A. 789, 38 L.R. A. 119, 63 Am.St.Rep. 493; Disconto-Gesellschaft v. United States Steel Corp., 267 U.S. 22, 28, 45 S.Ct. 207, 69 L.Ed. 495.

As I read the New York decisions they permit the application of the doctrine of title by estoppel as between an assignor and assignee of non-negotiable instruments where the assignor has clothed an agent with apparent full indicia of ownership. In Moore v. Metropolitan Nat. Bank, 1873, 55 N.Y. 41, 14 Am.Rep. 173, the court applied the doctrine in the case of a nonnegotiable certificate of indebtedness of the State of New York for $10,000 held by one Levi Moore and bearing assignment thereon from him as folows:

"10,000.

"For value received, I hereby transfer, assign and set over to Isaac Miller the within described amount, say ten thousand dollars.

"Levi Moore"

Miller made a similar assignment thereof to the Metropolitan National Bank, a bona fide purchaser for value. The court held that the bank obtained a good title despite the fact that Miller had obtained the certificate from Moore by misrepresentation. It will be noted here that the assignment was not in blank (as in the instant case) but was a full and complete assignment to a named assignee. An examination of the later New York cases cited by Mr. Pomeroy as impliedly

inconsistent with this holding[3] do not appear to have questioned this authority on the point as to title by estoppel between assignees; and in still later cases it seems to have been definitely approved. Rapps v. Gottlieb, 142 N.Y. 164, 167, 36 N.E. 1052; Merchants' Bank v. Weill, 163 N.Y. 486, 490, 57 N.E. 749, 79 Am. St.Rep. 605; Persky v. Bank of America Nat. Ass'n, 1933, 261 N.Y. 212, 220, 185 N.E. 77, 80. In the last cited case the court says:

"At times, it is true, the doctrine of estoppel may preclude a defendant from asserting a defense against an assignee which he might have asserted against the assignor (see McNeil v. Tenth National Bank, 46 N.Y. 325, 7 Am.Rep. 341; Moore v. Metropolitan Nat. Bank, 55 N.Y. 41, 14 Am.Rep. 173)."

However the question still remains whether, in applying the doctrine of estoppel to these non-negotiable instruments, a mere blank assignment thereon by the holder with delivery to an agent who abuses his authority will continue clothing him with sufficient indicia of ownership to protect a bona fide purchaser or pledgee who takes a transfer from the agent, where the agent has not filled in the blank before the transfer. Moore v. Metropolitan Nat. Bank, supra, seems to be the strongest New York case in support of the plaintiff's position on this point; but as noted, it dealt with a full and completed assignment to a named assignee, while in this case there was merely a blank assignment on the back of the bond which did not include a power of attorney to make transfer on the books of the issuing debtor, as and where also the face of the certificate states that it is transferable only in person or by attorney on the books of the debtor. In Cowdrey v. Vandenburgh, 101 U.S. 572, 576, 25 L.Ed. 923, the court points out the distinction between a completed assignment naming the assignee and one merely in blank, with respect to an assignee who takes a non-negotiable instrument so assigned. The result is that there is apparently no New York case which has applied the doctrine of estoppel to a situation like that presented in the instant case. And in view of the nature of registered bonds, it is at least quite doubtful that the mere blank assignment of the certificates by Rothschild & Co. constituted sufficient indicia of ownership to justify the plaintiff bank in accepting them without inquiry. In People's Trust Co. v. Smith, 215 N.Y. 488, 491, 109 N.E. 561, 562, L.R.A.1916B, 840, Ann.Cas.1917A, 560, the court, on the facts, refused to apply the doctrine of title by estoppel in the case of a bond and mortgage. It was said: "Estoppel, therefore, cannot be built in this case upon any representation that was *intended* by the true owner. It must be built, if at all, upon the owner's negligence. To make out an estoppel on that ground, it is not enough to show the owner was careless. He must have been careless in respect of some duty owing to the plaintiff or the public. Knox v. Eden Musee, Americain Co., 148 N.Y. 441, 462, 42 N.E. 988, 31 L.R.A. 779, 51 Am.St.Rep. 700; Swan v. N. B. Australasian Co., 2 H. & C. 191."

Some effort was made by the plaintiff in this case to support its position on this point by evidence of customary dealings in New York with respect to transfers and deliveries of such instruments, but it was insufficient in certainty with respect to the particular type of certificates here involved. See Federal Reserve Bank v. Malloy, 264 U.S. 160, 171, 44 S.Ct. 296, 68 L.Ed. 617, 31 A.L.R. 1261. I therefore incline to the opinion that the mere assignment of the certificate in blank was not sufficient indicia of ownership to carry good title to the Bank as against Rothschild & Co. without inquiry.

But even if it could be held to the contrary under the New York cases the plaintiff, to prevail on this issue of title, must show that the certificates assigned in blank were *intrusted* by Redmond & Co., or Rothschild & Co., to an agent who abused his authority. As the certificates were in fact delivered to the proper receptacle provided by Rothschild & Co., it cannot be said that there was a misdelivery by Lame, Redmond's agent, even though Rothschild & Co. refused to admit delivery and make payment. The plaintiff must therefore show an intrusting by Rothschild & Co. to some agent, with-

[3] The cases so referred to by Pomeroy are Barry v. Equitable Life Assur. Soc., 59 N.Y. 587; Trustees of Union College v. Wheeler, 61 N.Y. 88; Cutts v. Guild, 57 N.Y. 229; Hall v. Erwin, 66 N.Y. 649; Greene v. Warnick, 64 N.Y. 220; Crane v. Turner, 67 N.Y. 437, and Davis v. Bechstein, 69 N.Y. 440, 25 Am.Rep. 218.

in the meaning of that word in this connection. Its counsel contends that this is shown under the New York law. Its position is based on judicial decisions of the State rather than upon any statute. The Uniform Stock Transfer Act has been in force in New York since 1913, see New York Personal Property Law, §§ 162–165, Consol.Laws, N.Y. c. 41; and in Maryland since 1910, Md.Code, Art. 23, § 51 et seq. If the certificates sued on were within the purview of this Act it is clear enough that the plaintiff would have obtained good title.[4] Turnbull v. Longacre Bank, 249 N.Y. 159, 165, 163 N.E. 135. It is equally clear that the certificates sued on are not within the scope of the Act which relates only to ordinary stock certificates for shares of a corporation. It is suggested by the plaintiff that as the certificates are called "stock" the Act might be considered applicable; but in view of the very distinct difference between a registered bond and a stock certificate I cannot think this contention tenable. But the Bank does much more seriously contend that the New York judicial decisions sustain its position. I have carefully considered the decisions referred to in this connection but am unable to reach the conclusion that the plaintiff's title is good under the circumstances of this case. Van Schaick v. National City Bank, 245 App.Div. 525, 283 N.Y.S. 372 (affirmed on appeal without opinion, 271 N.Y. 570, 3 N.E.2d 189) is chiefly relied on. That recent case has some similarity on the facts to this, but has decisive differences. It dealt with an ordinary stock certificate and not with a non-negotiable bond. The owner entrusted it to a messenger for a particular delivery but the messenger made a misdelivery, not amounting to theft or criminal misappropriation. The case was distinguished from Knox v. Eden Musee Americain Co., 148 N.Y. 441, 42 N.E. 988, 31 L.R.A. 779, 51 Am.St.Rep. 700, where a dishonest employe stole certificates of stock endorsed in blank from a safe of his employer and negotiated them.[5] Under the facts found here the certificates were delivered at the office of Rothschild & Co. into the place provided therefor and must be held to have reached the lawful possession of Rothschild & Co. There is no evidence as to how they left that possession, and particularly there is no evidence that Rothschild & Co. entrusted them to an agent or messenger for delivery to any one or for any other purpose; nor is there any evidence as to how Cronemeyer came into possession of the certificates. In this respect the burden of proof was clearly upon the plaintiff Bank. Nor was the Bank really prudent in lending on the certificates. Evidently the cashier relied almost wholly upon the reputation and supposed integrity of Cronemeyer whom he knew either personally or by reputation, but with whom the Bank had had no prior dealings. He accepted the certificates without any independent guarantee of the genuineness of the blank assignment by Rothschild & Co.; and indeed an examination of the signature clearly shows it to be illegible to any one who was not familiar with it, as was the case with the cashier. A bank that accepts paper purchased or taken as collateral must be held to know whether it is negotiable or not. State Bank v. Central Merc. Bank, 248 N.Y. 428, 162 N.E. 475, 59 A.L.R. 1473. If the cashier had carefully examined the certificates he should have appreciated that they were registered bonds and not stock certificates. Doubtless he accepted them as he later accepted the Buffalo General Electric interim receipts for bonds on the assumption that both were negotiable instruments; but in this he was mistaken. Rothschild & Co. v. First National Bank of Binghamton, supra. In that case the New York courts held that the Bank did not obtain a good title to the interim receipts as against Rothschild & Co. be-

---

[4] Maryland Code, Art. 23, § 55, provides: "The delivery of a certificate to transfer title, in accordance with the provisions of section 51, is effectual, except as provided in section 53, though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title."

[5] Other New York cases relied on by counsel for the plaintiff are McNeil v. Tenth Nat. Bank, 46 N.Y. 325; Union Trust Co. v. Oliver, 214 N.Y. 517, 108 N.E. 809; both involving stock certificates or voting trust stock certificates; but in People's Trust Co. v. Smith, 215 N.Y. 488, 109 N.E. 561, L.R.A.1916B, 840, Ann.Cas.1917A, 560, the New York court refused to apply the estoppel doctrine to a bond and mortgage, which it pointed out was of a different nature.

cause the latter had not voluntarily entrusted them to an agent for particular delivery with subsequent misappropriation, but had been induced to part with the securities by a trick amounting to larceny. Similarly in principle as to the city certificates, there is no evidence here that Rothschild & Co. voluntarily entrusted them to an agent for particular disposition. The reasonable inference is that they were stolen or otherwise wrongfully misappropriated from Rothschild & Co. by some employe or outsider. It is true that the certificates when delivered by Redmond & Co.'s messenger did not reach the then cashier of Rothschild & Co. in the cage, but as they were delivered into the cage by the messenger they probably came into the custody (as distinct from the legal possession) of some other employe of Rothschild & Co. and if so, their wrongful misappropriation was either embezzlement or larceny on common law principles, or theft if found and misappropriated by some other person under circumstances from which the ownership of Rothschild & Co. should have been inferred. At all events there is no testimony that any authorized agent of Rothschild & Co. entrusted the securities to any one, and it is stipulated as a part of the facts of the case that "nobody with authority to authorize the sale, transfer or delivery of said securities on behalf of L. F. Rothschild and Company ever authorized any sale, transfer or delivery of said certificates numbered 639 and 640 at any time to any person, firm or corporation, except the original sale and delivery to Redmond and Company." In Manhatton v. Morgan, 242 N.Y. 38, 150 N.E. 594, it was held that a bona fide purchaser did not get good title to interim receipts for bonds deliverable to bearer (though technically not negotiable) which had been stolen from the true owner.

■ The plaintiff also contends that its title was properly derived from Redmond & Co. by estoppel. As to this it is urged that between Rothschild & Co. and Redmond & Co. the loss was treated as that of Redmond & Co., and that Redmond & Co. entrusted the securities to a messenger who did not effect good delivery by reason of the loose practice in not getting a receipt for the securities when delivered to Rothschild & Co. Certainly the practice referred to was very lax, but the basis for the contention disappears with the finding that the messenger in fact did deliver the certificates to Rothschild & Co.

■ *The City's equities.* Even if the plaintiff did acquire a good title by estoppel against Redmond & Co. and Rothschild & Co., nevertheless it is not entitled to prevail in this suit against the City if the latter had a sufficient equity in its favor against Rothschild & Co. when it first received notice of the plaintiff's claim. The law properly applicable here is that of Maryland and not of New York, although I am not advised of any difference between the laws of the two States on the point. National Bank of Bristol v. B. & O. R. R., 99 Md. 661, 675, 59 A. 134, 105 Am.St.Rep. 321; Paepcke v. Paine, 253 Mich. 636, 235 N.W. 871, 75 A.L.R. 1205; Burns Mtge. Co. v. Fried, 292 U.S. 487, 495, 54 S.Ct. 813, 78 L.Ed. 1380; Restatement, Conflict of Laws, s. 336. Clearly the certificates are not negotiable, but only assignable. Nor is there any estoppel against the City sufficient to make the certificates negotiable by reason of the blank assignment form printed on the back of the certificates. This was possibly a recognition of the fact that the certificates were assignable, but it did not make them negotiable. Bank of United States v. Cuthbertson, 4 Cir., 67 F.2d 182, 186; State Bank v. Central Merc. Bank, 248 N. Y. 428, 162 N.E. 475, 59 A.L.R. 1473. And it is a thoroughly well established feature of the law of assignment of non-negotiable instruments that an assignee takes subject to all equities as between his assignor and the debtor. Schenuit v. Finance Corp., 148 Md. 403, 414, 130 A. 331; Gemmell v. Davis, 75 Md. 546, 553, 23 A. 1032, 32 Am. St.Rep. 412; 6 C.J.S., Assignments, p. 1164, § 114; First State Bank v. Pure Van Pipe Line Co., 5 Cir., 77 F.2d 820.

■■ In my opinion the City had such an equity against Rothschild & Co. when it first received notice of the plaintiff's claim. The Baltimore City Code (Ordinances of the Mayor & City Council) 1927, Art. 43, §§ 5-8, relate to the issuance by the City of duplicate certificates of City stock in the case the original certificates are lost or destroyed. It is there provided that the person making application for the new certificates "shall give at least 60 days notice by publication once a week, in two of the daily newspapers published in the City of Baltimore, describing such certificate or certificates, and at the same time

declaring his or her intention to make such application." It is further provided that the applicant must make oath "that such certificate or certificates were lost or destroyed; the circumstances, if any, under which said certificate or certificates were lost or destroyed"; and the City Register must be satisfied that the applicant is the owner, agent or representative of the owner of said lost certificates; and if the Register is not so satisfied he shall require the applicant to give an adequate indemnity bond. It is said that in practice such bonds are uniformly required. Rothschild & Co. promptly gave notice of the loss, applied for the issuance of new certificates, and complied with these provisions of the City Ordinances. After the requisite oath and advertisement had been duly made, and indemnity bond given, the City, on May 17, 1926, issued to Rothschild & Co. new certificates. These were not issued until seventeen days after the interest installment of May 1, 1926 had become due, and no one had applied therefor other than Rothschild & Co. Up to that time the City knew nothing to the contrary of the affidavit and was justified in believing that the certificates had been lost or stolen and that Rothschild & Co. was entitled to the new certificates. Thereafter and before notice of the plaintiff's claim the City was advised that the new certificates had been assigned to the National Surety Company and that it intended to sell them on the market. Furthermore, the new certificates were transferred on the books of the City to third persons before the plaintiff affirmatively proved the giving of notice of its claim. It seems sufficiently clear that the issuance of the new certificates to Rothschild & Co. of itself constituted in effect a payment or new obligation to Rothschild & Co. which precluded the latter from enforcing the old certificates, and thus constituted an equity in favor of the City superior to that of the plaintiff, even if it had good title by estoppel from Rothschild and Redmond. If the plaintiff had proven the giving of notice to the City prior to the transfer of the certificates on the books of the City to third persons, it might be arguable that the City should have refused payment or transfer of either the old or new certificates until the controversy as to title between the Bank and Rothschild & Co. had been settled. See Reynolds v. Title Guarantee & Trust Co., 240 N.Y. 257, 148 N.E. 514. But, as the burden of proof was on the plaintiff to show the time of giving notice, and I have not been able to find affirmatively that notice was given before the transfer of the certificates to third persons, that possible situation is not presented. If the Bank had been diligent in protecting its rights as assignee of these non-negotiable certificates, it would have promptly notified the City of its possession of them. Particularly is this true with respect to its failure to advise the City of its claim when the installment of interest fell due on May 1, 1926. Clearly the Bank was advised from the face of the certificates that the interest fell due on May 1, 1926 and the cashier of the Bank should have known from the condition of the certificates, which on their face made the interest payable to Rothschild & Co., and the assignment in blank by Rothschild & Co., that the interest payment would be made by the City to Rothschild & Co. and not to Cronemeyer, although apparently in accepting the certificates the cashier must have understood that Cronemeyer was the owner. There is no evidence that the Bank made any inquiry from Cronemeyer or any one with regard to this interest payment. The failure of the Bank to more promptly notify the City of its claim has brought about the situation whereby the City acquired a superior equity in the matter. Gemmell v. Davis, 75 Md. 546, 553, 23 A. 1032, 32 Am.St.Rep. 412; Noble v. Turner, 69 Md. 519, 16 A. 124; Harr v. Market Street T. & T. Co., 326 Pa. 410, 190 A. 903, 906; State Bank v. Central Merc. Bank, 248 N.Y. 428, 162 N.E. 475, 59 A.L.R. 1473.

I attribute no controlling effect to the City Ordinances, as they are only declaratory of the general law that is applicable to non-negotiable instruments. Where the holder of a non-negotiable instrument has lost it or it has been destroyed, he can legally require the debtor to issue a duplicate, 98 A.L.R. 1489; and under the applicable Maryland statute he can also properly insist on payment in accordance with the terms of the lost instrument even if negotiable, upon the giving of an appropriate bond. Md.Code, Art. 75, § 18. It may be noted that the Ordinances, in providing for the issuance of duplicate certificates without a surety bond, on certain conditions, seem to be a plain expression on the part of the City that the certificates are non-negotiable in its understanding.

■ It is also stressed by counsel for the plaintiff that, as the City has a surety bond to protect it from possible liability in this case, the real contest here is between the plaintiff and the Surety Company. It appears that the original surety bond was given in 1926 by the National Surety Company as then constituted, but it is conceded by counsel for the defendant here that the new National Surety Company has assumed the liability. But I am unable to see that the existence of the surety bond can properly affect the determination of the issues presented by the suit. The Surety Company is not a party to the case and the plaintiff has not asked any relief against it. The case is, therefore, not legally different by reason of the existence of the bond.

*Limitations and Laches.* The conditions relating to these defenses are unusual. The defense of laches would seemingly be good in view of the unexplained long delay of the plaintiff in prosecuting its claim, if the suit were in equity. Plaintiff's claim as here asserted is purely legal in nature, being for the recovery of the principal sum of money represented by the certificates, with interest thereon. The plaintiff submits the logical argument that it is the bona fide assignee of the certificates; that they are under seal; that the applicable Maryland period of limitations therefor is twelve years from the maturity of the principal, May 1, 1933; that its suit is clearly within the period of limitations; and therefore it is under no obligation to explain the delay so long as it has not been beyond the period of limitations. On the other hand the position taken by the defendant is that the provision on the face of the certificate, that it is transferable only upon the books of the City, is a limitation on the assignability of the certificate (see State Bank v. Central Merc. Bank, 248 N. Y. 428, 162 N.E. 475, 59 A.L.R. 1473) which has the effect of denying to the assignee any right of any kind on the certificate itself until transfer has been duly made on the books of the City. Reference is made in this connection to the case of Michaelson v. Sokolove, 169 Md. 529, 182 A. 458, holding that the Maryland statute which authorizes an assignee of a contractual chose in action to sue in his own name does not of itself expand the rights of the assignee; and therefore if there is a contractual restriction on assignment the permissive statute does not apply. It is therefore contended that when the plaintiff gave notice of its claim and requested the transfer of the certificates, with refusal by the City, the only rights of action or remedies available to the plaintiff were (1) to sue in equity for specific performance of the obligation to make the transfer; or (2) to sue for damages for the refusal to transfer. See Virginia Pub. Serv. Co. v. Steindler, 166 Va. 686, 187 S.E. 353, 105 A.L.R. 1413. It is pointed out that if the plaintiff had sued for specific performance it would have been barred by laches, and if the suit had been for damages the applicable limitation period would have been three years. In either event under the facts the plaintiff's claim would be barred because this suit was not instituted until more than 12 years after the demand for and refusal of transfer.

In answer to the latter contentions the plaintiff points out that the provision of the certificates which restricts transfers to those made by the City on its books, was evidently copied in phraseology from the similar wording of the ordinary corporation stock certificate for shares; the adjudicated purpose of which is to protect the corporation in its dealings with the registered holder, (Baltimore City Pass. Ry. v. Sewell, 35 Md. 238, 6 Am.Rep. 402; 14 C.J. 751; Christy, Transfer of Stock, s. 31), and that it should have no broader effect. In line with this view the plaintiff says that the like phraseology on the ordinary stock certificate does not exempt the corporation, which improperly refuses a transfer, from liability for damages therefor, and, with respect to the applicable period of limitations, it is pointed out that there is a difference between the nature of the causes of action which respectively arise on the refusal to transfer a stock certificate, and a refusal to transfer a chose in action for the payment of money under seal.

These respective contentions are interesting, arising as they do in an unusual way, and the proper rule to be applied in the particular case is not free from difficulty. As the point is not essential to the determination of this case, it is deemed more appropriate to defer its decision until it arises in a case where it is the controlling issue.

As a result of the application of the law to the facts, I conclude that the verdict and judgment must be for the defendant. The clerk is therefore instructed to enter a judgment for the defendant with taxable court costs. The facts and con-

clusions in this opinion are intended to be in compliance with the new rule 52 of Federal Procedure, 28 U.S.C.A. following section 723c.