MARYLAND COOPERATIVE MILK PRODUCERS,
INC., ET AL *v.* BELL ET AL
(Two Appeals in One Record)

[No. 64, October Term, 1954.]

170

*Decided January 18, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Harry Troth Gross* and *John H. Dryden* for Maryland Cooperative Milk Producers, Inc.

*Edwin J. Wolf* and *John Wood,* with whom was *Arthur R. Padgett* on the brief, for the Alexanders.

*I. Sewell Lamdin,* with whom were *Howard Calvert Bregel* and *Calvert Ross Bregel* on the brief, for Marshall W. Bell.

HENDERSON, J., delivered the opinion of the Court.

These appeals are from judgments of the Superior Court of Baltimore City in a case, heard by the court without a jury, arising out of an attachment proceeding filed by Franklin P. Alexander and Marion C. Alexander, his wife, on July 18, 1951, upon a judgment of some $17,-000 held by them against William K. and Alice C. Unger. On the same day attachments were laid in the hands of Maryland Cooperative Milk Producers Association and on July 23, 1951, in the hands of Royal Dunloggin Dairy. Both garnishees duly appeared and filed pleas of *nulla bona.* On January 24, 1952, Marshall W. Bell intervened by leave of court and laid claim to the property attached, relying upon an alleged assignment. The attaching creditors filed an answer to the claimant's petition denying generally that he was entitled to the fund in preference to their attachment. At the conclusion of the case

the trial judge delivered an oral opinion in which he found that on July 17, 1951, the Cooperative had applied the amount credited on its books to Unger's account, in payment of an indebtedness on a promissory note and chattel mortgage then due to it from the Ungers. Accordingly, he entered judgment in favor of this garnishee. He found, however, that the alleged assignment to Bell was valid and that the mortgage was not in default at the time of the execution of the assignment. He concluded that the assignment was entitled to preference. Accordingly, he entered judgment in favor of Bell for the sum of $2,893.06, the amount admittedly due to Unger at the time it was applied to the payment of his indebtedness to the Cooperative. He also entered a judgment of $192.97 against Dunloggin, in favor of Bell. The Cooperative appealed from the judgment against it, but Dunloggin did not appeal.

The record is not clear as to the other appeals. The titling of the record indicates that three appeals were entered, but the docket entries do not show more than two. Moreover, the record itself contains only two, one by the Cooperative from the judgment in favor of Bell, and one by the Alexanders "from the judgment of May 24, 1954, in favor of Marshall W. Bell, claimant against Maryland Cooperative Milk Producers, Inc. and Royal Dunloggin Dairy, garnishees of William K. Unger and Alice C. Unger, his wife". In the absence of an appeal from the judgment against the attaching creditors in favor of the Cooperative, it is difficult to see what standing the attaching creditors would have to contest the ultimate award of the fund to a third party. The only question argued in the brief for the Alexanders is whether the court had jurisdiction to hear the claim of Bell. It is contended that the court was without jurisdiction to hear that claim "so that the judgments herein were a nullity". Again, it is difficult to see how the court could lose its jurisdiction to decide the question of priority as between the attaching creditors and the garnishee, even if it were without jurisdiction to decide the claimant's

case. The other appellant, the Cooperative, does not raise the question of jurisdiction, nor was the point raised in the court below by any party.

We think it is perfectly clear that the jurisdictional point is without merit. Code (1951), Art. 9, sec. 47, expressly provides for intervention by a claimant in an attachment proceeding, and in *Fetterhoff v. Sheridan,* 94 Md. 445, 452, it was said: "There can be no doubt that in this State the *bona fides* of the assignment of a debt can be inquired into under an attachment laid in the hands of a debtor, as garnishee." See also *Kean v. Doerner,* 62 Md. 475. The case of *U. S. Express Co. v. Hurlock,* 120 Md. 107, is not to the contrary. There the subject matter of the attachment, stock in a foreign corporation, was not within the jurisdiction, and the court held that the point could be raised for the first time on appeal. Perhaps the question could be raised *ex mero motu. Langville v. Langville,* 191 Md. 103, 110. But in the instant case the court had jurisdiction of the parties and the subject matter. Even if the court erred in ruling that the assignment was valid, that would not go to the point of jurisdiction, nor would it affect the question as to the relative rights of the Cooperative and the attaching creditors.

On the latter point, if the question is before us, we see no reason to doubt the correctness of the court's ruling. It was shown that on June 1, 1950, the Cooperative advanced $31,000 to Unger, trading as Redlands Transportation Co., to purchase trucks and equipment for use in the hauling of the milk, produced by the members of the Cooperative, on a specified route under permit of the Public Service Commission. A chattel mortgage was executed and duly recorded. It recited that Unger had given his note payable in monthly installments of $250 each with interest at $2\frac{1}{2}\%$, beginning June 15, 1950. It provided that on default in the payment of any installment, or in any covenant of the mortgage, the whole debt should become due and demandable. One of the express covenants was that Unger should keep the mortgaged

property insured to the extent of at least $31,000. On June 29, 1951, the insurance carrier notified the Cooperative that it had cancelled Unger's insurance, effective June 25, 1951. This action was inspired by the fact that Unger was in financial difficulties, and that checks, given by him to the Department of Motor Vehicles for license tags on or about June 1, had been returned marked "insufficient funds".

There was never default in the installment payments, which the Cooperative deducted from hauling charges payable to Unger on the fifteenth of each month. A deduction covering the installment due July 15, 1951, was made on the books of the Cooperative against amounts credited to Unger's account for the month of June, leaving a balance due to Unger of $2,893.06. On June 29, 1951, Bell's nephew, Zent, who traded with Bell under the name of Bell Transportation Co., took over the route by authority of the Public Service Commission. On July 16, the Cooperative instituted foreclosure proceedings under its chattel mortgage and on July 17, 1951, it entered on its books the balance due to Unger as a credit against the mortgage indebtedness. We find nothing in the record to indicate that this balance was not held by the Cooperative in its corporate capacity, nor was any such point raised in this Court or in the court below. The attachment proceeding was filed and attachment laid on the following day.

Under these circumstances we think the right to make the set-off is clear. The default in the covenant to keep the property insured was a breach of the obligation under the mortgage, and moneys due to Unger were appropriated and applied before the attachment was laid. Under all the authorities this is enough to defeat the attachment. See Note 106 A. L. R. 62. Indeed, the Maryland cases seem to recognize a right of set-off as against an attaching creditor even where the obligation of the debtor is not due at the time of the attachment but becomes due before trial. *Farm. and Merch. Bk. v. Franklin Bk.*, 31 Md. 404, 412. In that case Judge Alvey said

that the retention of the amount standing to the credit of a depositor "was good matter of set-off, as well against the attaching creditor as against his debtor."

The question of the priority of the alleged assignment, raised on the appeal of the Cooperative, presents a somewhat different question. On or about June 8, 1951, Unger and his wife executed a paper addressed: "To Whom It May Concern," reading: "Effective June 1, 1951, money payable to Redlands Transportation Co. is collectable by Marshall W. Bell." Bell had formerly held a permit for the route and on May 31, 1951, there was a conference with the Public Service Commission attended by Unger, Unger's father-in-law Alexander, Bell and Zent, with a view to transferring Unger's permit to Zent, because of Unger's financial situation. Nothing came of this, since Unger still had hopes of raising money. However, it is undisputed that Bell actually did the hauling on Unger's route beginning June 1, using a few of Unger's trucks or truck bodies until their licenses were revoked. There is a dispute as to whether the Cooperative was aware of the situation although its members undoubtedly were. On June 25, 1951, Bell's attorney wrote the Cooperative referring to the assignment and calling upon it to pay Bell instead of Unger the hauling charges for the month of June that would be due to Unger on July 15. On June 26 a copy of the alleged assignment was received by the Cooperative from its attorney, who warned it not to recognize Bell as Unger still held the permit.

The Cooperative contends that the paper executed was not an assignment at all, but merely an authorization to collect. It is true that a mere promise to assign, or an order that retains control over the fund, or a power of revocation, is generally held not to pass legal title. *Farmers' Bank v Blount*, 8 F. 2d 443 (CCA 4th) ; *Farmers' Bank v. Hayes*, 58 F. 2d 34 (CCA 6th) ; 2 *Williston, Contracts* (Rev. ed.), § 425. But if the intent is clear, no particular phraseology need be used. We think the trial court was not clearly wrong in finding that the paper

constituted an assignment under the circumstances. There was testimony from a number of witnesses that after June 1 all the drivers and expenses of operation were paid by Bell. Unger was quite unable to finance the work, and in the absence of any reservation we think the intent can be spelled out to transfer the compensation unconditionally. Cf. *Williston*, § 425, *supra*.

We find no merit in the contention that the assignment was invalid because its subject-matter was future earnings. The right of an assignee of a money claim to sue in his own name was long ago established, Code (1951), Art. 8, sec. 1, subject, however, to the right of any defendant to "make the same legal or equitable defenses as might or could have been had and maintained against the assignor at the time of such assignment and before notice thereof, and to the same extent." Code (1951), Art. 8, sec. 4. In *Seymour v. Finance & Guaranty Co.*, 155 Md. 514, and *Baust v. Commonwealth Bank*, 158 Md. 280, 284, it was held that future payments were assignable, if called for under an existing enforceable contract, since they had a potential existence and the assignment passed at least an equitable title. In the *Baust* case it was also held that there was no need to prove the precise terms of the contract. See also *In Re Talbot Canning Corporation*, 35 F. Supp. 680 (D.C. Md.), and 2 *Williston, Contracts* (Rev. ed.), § 413.

Code (1951), Art. 8, sec. 2, adopted by ch. 728, Acts of 1943, provides that "All written assignments, * * * of accounts receivable and amounts due or to become due on open accounts or contracts, * * * shall be valid and legal and shall pass the title * * * to the assignee thereof, and shall take effect according to the terms of the assignment, without the necessity of notice to the debtor, * * * ", with a proviso protecting the debtor where he discharges obligations of the original owner without knowledge of the assignment. This statute clearly recognizes the right to assign amounts to become due on an existing contract, and also obviates the necessity of notice in order to validate the assignment. Probably it

was not designed to change the preexisting law, but to dispense with notice as a requirement of the Federal law, as construed in "perfecting" claims against a subsequent trustee in bankruptcy of the assignor. See 2 *Williston, Contracts* (Rev. ed.), § 435A, 1954 Suppl., p. 61. In *McDowell, Pyle & Co. v. Hopfield,* 148 Md. 84, and *Seymour v. Finance & Guaranty Co., supra,* it was held that notice was not necessary to validate an assignment, even before the statute. See also 2 *Williston, Contracts* (Rev. ed.), § 433. But notice may still be a factor in determining priorities as between the various parties or claimants, for the assignment is equitable in its nature and is open to equitable defenses. See *Lambert v. Morgan,* 110 Md. 1; *Pen Mar Co. v. Ashman,* 152 Md. 273; *In Re Seim Const. Co.,* 37 F. Supp. 855 (D.C. Md.) ; *Union Trust Co. of Maryland v. Townshend,* 101 F. 2d 903 (CCA 4th) ; 2 *Williston, Contracts,* (Rev. ed.), § 432 and § 447; *Restatement, Contracts,* § 167; 1 Md. L. Rev. 1. We do not understand that the Act of 1943 was designed to alter the general rule or to repeal Code (1951), Art. 8, sec. 4, *supra.*

The controlling question in the case, then, is whether a debtor can assert against an assignee a counterclaim based on the obligation of an assignor maturing subsequent to the assignment but before notice thereof. The answer to this question is not dependent upon the form of the action, but would be the same if raised in a suit by the claimant rather than in the attachment case. Nor does it involve the rights of the claimant as against an attaching creditor. We have found no Maryland case directly in point. In *Schenuit v. Finance Corp.,* 148 Md. 403, it was held that a purchaser of tires could recoup, as against an assignee of the sales invoices, for breach of warranty against defects in the tires not discovered until after the assignment. The court relied on the rule that the assignee, of a non-negotiable *chose in action,* takes it subject to all legal and equitable defenses of the debtor, citing *Harwood v. Jones,* 10 G. & J. 420. See also *Gemmell v. Davis,* 75 Md. 546, 553; *First*

*Nat. Bank v. Mayor & City Council,* 27 F. Supp. 444; aff. 108 F. 2d 600 (CCA 4th) ; and Note 87 A. L. R. 187. Since the defenses existed at the time of the assignment, under the contract with the assignor, they could be raised against the assignee as well as the assignor. The earlier cases of *Fusting v. Sullivan,* 51 Md. 489, and *Richardson v. Anderson,* 109 Md. 641, were distinguished principally on the ground that the obligations on which the counterclaims were based were not acquired until after the assignment, although it was also noted that the counterclaims in those cases grew out of separate transactions. We think the latter distinction is not well founded. The technical distinction between recoupment and set-off should not be controlling.

The *Schenuit* case can perhaps be distinguished from the instant case on the ground that the breach of warranty had occurred prior to the assignment. However, the better rule would seem to be that this also is not controlling. See 4 *Corbin, Contracts* (1951 ed.), §§ 896, 897. It has been held in Pennsylvania that a counterclaim may be allowed even where it matures after the assignment, if the right was inherent in the outstanding obligation. *Northwestern Nat. Bank v. Commonwealth,* 27 A. 2d. 20 (Pa.). *A fortiori,* it is allowed where the indebtedness has matured. *Peoples Pittsburgh Trust Co. v. Commonwealth,* 60 A. 2d 53 (Pa.). The *Restatement, Contracts,* § 167, recognizes a right "to all set-offs and counterclaims of the obligor which would have been available against the obligee had there been no assignment, provided that such defenses and set-offs are based on facts existing at the time of the assignment." In speaking of this section, *Williston, Contracts* (Rev. ed.), § 432, p. 1246, the learned author states: "The denial of a right of set-off because either the assigned claim or the cross-claim was not due at the time of the assignment is, however, not consistent with the general principle allowing set-off against the assignee of claims due from the assignor; and there is good authority to support the rule that the only questions should be, (1) did the claim against the assignor

exist whether matured or not, before notice of the assignment, and (2) were both claims matured when the set-off was asserted, and this is the rule that the Restatement of Contracts puts forward. * * * Until notice of the assignment, the debtor should be allowed to assume that he is under contract with the assignor whether the assignor's claim or his own is matured or not." See also 2 *Williston, Contracts* (Rev. ed.), § 447. Even after notice, Williston takes the view that the debtor may set up failure of the assignor to fulfill his part of an executory contract, payments under which are assigned. 2 *Williston, Contracts* (Rev. ed.), § 433, p. 1253.

In the instant case we think the set-off should prevail. At the time of the assignment Unger was under an obligation to keep up the insurance on the mortgaged property, some of which was actually used by the assignee, and the breach matured the indebtedness before the Cooperative received notice of the assignment. Whatever the situation might be in a suit by Bell on *quantum meruit* against the Cooperative or its members, the claim here is based on the contract between Unger and the Cooperative, Bell standing in Unger's shoes. If the suit were by Unger, surely the Cooperative could plead a set-off, even though the transactions were separate though related. The potentiality of a default in the mortgage was an existing fact at the time of the assignment of future payments under the contract. The default had occurred when these payments became due. The case falls squarely into the pattern outlined by Williston and the Restatement, and seems in line with the Maryland cases.

> *Judgment against the Maryland Cooperative Milk Producers Association reversed, and judgment entered in its favor. Costs to be paid equally by the Alexanders and Bell.*