**FIRST ALABAMA BANK OF BIRMINGHAM, Plaintiff,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, INC., Defendant.**

**Civ. A. No. CA 75–G–2138–S.**

United States District Court,
N. D. Alabama, S. D.

March 10, 1977.

Robert B. Rubin, Sirote, Permutt, Friend & Friedman, P. A., Birmingham, Ala., for plaintiff.

Thomas E. Maxwell, Maxwell & Fincher, Birmingham, Ala., Allen Poppleton, Bradley, Arant, Rose & White, Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This case involves resolution of the competing claims of a construction contractor's assignee bank and its surety to contract progress payments disbursed by the owner of the project to the surety which immediately disbursed equivalent funds, by means of its own checks, to unpaid subcontractors and suppliers designated by the contractor as due such funds.

Because of the several contentions of the assignee bank, herein after stated, a more lengthy than usual statement of pertinent facts is called for.

In December, 1971, Marsh and Daniel, Inc. (the "Contractor") entered into a financing arrangement with Exchange Security Bank, predecessor of plaintiff herein (the "Bank"), and in connection therewith executed a general assignment of all contract proceeds, both present and future; this general assignment was recorded in accordance with the Alabama Uniform Commercial Code on December 8, 1971. Thereafter from time to time the Contractor borrowed from the Bank and from time to time repaid to the Bank, a portion of its debts. On February 21, 1975, the Contractor consolidated its then outstanding indebtedness to the Bank executing a single note for $91,739.23. Subsequently, the Contractor borrowed an additional $25,000 from the Bank on February 28, 1975, and an additional $16,000 on April 4, 1975.

On May 14, 1974, in order to induce the defendant (the "Surety") to issue labor and material payment bonds and performance bonds on its behalf, the Contractor executed a general indemnity agreement, which assigned, transferred and conveyed to the Surety all rights of the Contractor in any construction contracts into which it might enter, or additions or alterations thereto, conditioned, *inter alia*, on the failure, refusal or inability of the Contractor to perform the terms and provisions of any such contract, or the failure, delay, refusal or inability of the Contractor to pay for work and labor performed on any such contracts.

The Surety did not then, nor has it ever, recorded its general indemnity agreement in accordance with the Alabama Uniform Commercial Code.

On October 8, 1974, the Contractor entered into a contract (the "Contract") with the University of Montevallo Board of Trustees (the "Owner") for the construction and erection, within 210 days, of an environmental safety building (the "Project") in accordance with plans and specifications prepared by the Owner's architect, Dampi-

er-Harris & Associates (the "Architect"). One condition of the Contract was that the Contractor was required to post both a performance bond and a labor and material bond, each in the amount of $192,000, the bid price on the Project, in favor of the Owner; the labor and material payment bond was also required by Title 50, Section 16, Code of Alabama, since the Project constituted a public work within the meaning of that statute. A further condition of the Contract was that the Contractor would promptly pay all who supplied labor and materials for the Project.

The Contractor obtained from the Surety and posted the required labor and material payment bond and the performance bond, and was issued a notice to proceed on October 10, 1974, making May 6, 1975, the completion date on the Project.

The Contractor commenced performance immediately, and submitted several monthly pay requests which were paid by the Owner, but as early as December, 1974, the Architect began receiving complaints from some of the Contractor's subcontractors and suppliers that they were not receiving payment from the Contractor for work performed and materials supplied to the Project. Because of these complaints, the Architect, acting pursuant to the terms and conditions of the contract which authorized withholding of funds upon notification that subcontractors and suppliers were not being paid, on January 29, 1975, notified the Contractor that he would not authorize payment by the Owner on a future payment request of the Contractor without certification by the Contractor that subcontractors and suppliers had been paid by the Contractor for work performed and materials delivered in the previous month; i. e., that previous payments made pursuant to the Contractor's payment requests had in fact been used to pay subcontractors and suppliers.

The Owner and the Architect continued to receive complaints from the Contractor's subcontractors and suppliers that they had not been paid for work and materials supplied and billed for; e. g., on February 7, 1975, the Architect notified the Contractor that he had received notice from Hackney Steel company, the Contractor's steel supplier for the Project, that its billing to the Contractor of October 28, 1974, for $2,644.46 had not been paid. Because of these complaints, on February 27, 1975, the Architect again notified the Contractor that certification of payment must be submitted with future estimates before they would be honored, and on or about March 9, 1975, the Architect met with the Contractor to discuss the contractor's unpaid bills and the complaints of its subcontractors and suppliers. Nevertheless, the Owner and the Architect continued to receive complaints of nonpayment from the Contractor's subcontractors and suppliers and during the month of March, 1975, it came to their attention that payroll checks issued to some of the Contractor's laborers on the Project had been returned marked "Insufficient Funds".

Although the Contractor had received payment from the Owner on its estimate submitted for work performed and materials supplied during January, 1975, it had not paid all of its subcontractors and suppliers' billings for work performed and materials supplied by them during that month. The Contractor's estimates submitted for work done and materials supplied during February and March, 1975, had not been paid because the Contractor could not provide the certificates of payment for previous work required of it by the Architect, and this state of affairs had come to the attention of the Surety, which, in late March, 1975, sent a representative to Birmingham. The Contractor's president indicated to the Surety's representative that the Contractor lacked sufficient funds to continue the Project and requested that the Surety finance it. The Surety's representative declined to do so but instead arranged to meet with the Architect in order to arrange for payments direct from the Owner to the Contractor's subcontractors and suppliers. On March 31, 1975, at the Surety's request, the Contractor notified the Owner that further payments on the Project should be made payable to the Contractor in care of the Surety and transmitted directly to the Surety.

The Architect, the Contractor and the Surety met several times during the last week of March, 1975, and agreed that at a meeting to be held at the Owner's offices the Owner's check for work done and materials supplied by the Contractor during the months of February and March would be delivered to the Surety which would immediately deliver the Surety's checks to the Contractor's unpaid subcontractors and suppliers.

The contemplated meeting occurred on April 10, 1975, and was attended by the Owner, the Contractor, the Surety, the Architect and a number of the Contractor's unpaid subcontractors and suppliers. As agreed, the Owner delivered to the Surety its check in the amount of $41,528.77 in payment for work done by the Contractor on the Project during the months of February and March. The Surety then delivered to the respective unpaid subcontractors and suppliers checks made jointly payable to the Contractor and the respective subcontractors and suppliers, as designated by the Contractor. The entire amount received by the Surety was disbursed at that time with the exception of two payments, one for $54.93 and another for $128.28 which were made on April 24, 1975, to laborers of the Contractor for work performed on the Project.

The Contractor continued working on the Project until April 23, 1975, but did not have sufficient funds to meet its payroll for the Project for the weeks ending April 4, April 11 and April 18, 1975. Payrolls for these weeks were subsequently paid by the Surety.

By letter of April 23, 1975, the Contractor gave the surety formal notice of default and inability to continue. Although the Project was due to be complete on May 6, 1975, on April 23, 1975, it was only between 50 and 75 percent complete, and in fact was not completed until July, 1975. After receiving notice of default from the Contractor, the Surety employed another contractor to complete the work at a cost of approximately $50,000 more than the contract price, which excess was borne by the Surety. The Surety also had to pay a number of claims of subcontractors and suppliers for work performed for, and materials supplied to, the Project, prior to April 23, 1975, and, indeed, prior to April 10, 1975. Stated otherwise, the subcontractors and suppliers who were designated by the Contractor for payment on April 10, 1975, were not the only subcontractors and suppliers then unpaid.

Against the background of the foregoing set of facts, the assignee Bank advances three contentions. First, it contends that since its December, 1971, assignment of future contract proceeds was promptly and properly recorded in accordance with the Alabama Uniform Commercial Code, while the Surety's May, 1974, indemnity agreement was never so recorded, the Surety has no enforceable claim to the contract funds which it received on April 10, 1975.

■ This contention has been uniformly rejected by all courts which have considered the question. The Uniform Commercial Code protects only "contract rights", not those that arise by operation of law, and every court which has considered the matter has held that a surety's equitable subrogation rights, upon default of its principal-contractor, arise by operation of law, not contract, and that therefore a surety is not required to file financing statements under the Uniform Commercial Code to preserve its rights to equitable subrogation in the event of its principal's default. See, e. g., National Shawmut Bank v. New Amsterdam Casualty Company (1st Cir. 1969), 411 F.2d 843; McAtee v. United States Fidelity & Guaranty Company (N.D. Fla.1975), 401 F.Supp. 11; Finance Company of America v. United States Fidelity & Guaranty Company, 277 Md. 177, 353 A.2d 249 (1976); Mid-Continent Casualty Company v. First National Bank & Trust Company (Okl.1975), 531 P.2d 1370. Therefore, the Court rejects the Bank's first contention and holds that the Surety's failure to record its indemnity agreement does not defeat its equitable right to subrogation with respect to contract funds earned prior to its principal's default.

■ The Bank's second contention, assuming the Surety has standing, is that,

since the Bank recorded its assignment in 1971, while the Surety did not even enter into its indemnity agreement until May, 1974, the Bank's rights are superior as previous in time.

However, the Bank's argument misconceives the operative event, which is not the execution of its assignment, but rather the execution of the Contract. This case does not concern the rights granted under the Bank's assignment and the Surety's indemnity agreement as *such*, but rather the question is what rights do those instruments give the parties in connection with the particular contract here involved, the Contract with the Owner; both instruments contemplate rights arising in the future, but those rights, whatever they may be, remain abstract rights until a construction contract comes into existence to which they can apply.

Thus, while the Bank's assignment gives it the right to contract funds, until the contract between Marsh and Daniel, Inc. and the University of Montevallo came into existence, the Bank had no right to that contract's funds. However, both by its terms and by operation of Alabama's "Little Miller Act", Title 50, Section 16, Code of Alabama, that contract did not come into existence until the Contractor posted with the Owner the Surety's performance and payment bonds—and the Surety's subrogation rights under its indemnity agreement attached to the contract at that time.

Thus, since there was no contract under which either party's rights might be perfected until the Surety's bonds were posted, the Court holds that the rights of both parties were perfected *simultaneously*, and therefore the Bank's prior recorded assignment gives it no advantage over the Surety. Parenthetically, the Court notes that this conclusion is in accord with the decision in *Finance Company of America v. United States Fidelity & Guaranty Company*, 277 Md. 177, 353 A.2d 249 (1976), where the Maryland Court of Appeals reached a similar conclusion under a slightly different set of facts.

The Bank's final contention is that the Contractor was not in default of its obligations under the Contract when the Surety "received" the Contract funds on April 10, 1975, in that the Contractor was still working, had not been declared in default, and had not acknowledged default; the Bank argues that under these circumstances default must be deemed to have occurred only when the Contractor acknowledged default on April 23, 1975.

A cursory reading of *Fidelity and Deposit Company of Maryland v. Scott Brothers Construction Company* (5th Cir. 1972), 461 F.2d 640, might indicate support for the Bank's position, for in that case it was held that the Contractor's formal declaration of default was the operative fact. *Id.* at 643. However, in the *Scott Brothers* case the court was careful to note, not once but twice, that formal notice of default controlled because in the circumstances of that case there was no evidence of actual default prior to formal notice:

"No contention is made that Scott had not satisfactorily performed the work for which the October 9 check was intended as payment." (*Id.* at 642)

\* \* \* \* \* \*

"Since Scott's performance of the West Point job is not contended to have been unsatisfactory, F & D is remitted to the declaration of default as a means of invoking its rights as subrogee, and the declaration was made on October 10 after the Bank received the check." (*Id.* at 643)

The court made it clear that "default" occurs *either* when a contractor declares default *or* when it materially fails in contract performance:

"What matters, however, is that F & D had no obligation to begin performance under its bond with Scott, and thus no rights to contract payments as subrogee, until Scott either stated that it could no longer continue on the job or until Scott materially failed in its performance." (*Ibid.*)

See also, *Travelers Indemnity Company v. West Georgia National Bank* (N.D.Ga. 1974), 387 F.Supp. 1090, where it is pointed out that all that is necessary for the surety

to prevail is that the contractor be in default as a matter of fact, and that the surety be obligated under its bond to perform; no formal declaration of default is required. There the court also noted that the precise time of default is determined by the facts in each case, and not the formal declaration or notification of the default.

In the instant case the evidence is abundantly clear that the Contractor was in default as a matter of fact long before April 10, 1975, in that it had failed to promptly pay subcontractors and suppliers for work performed and materials supplied. Indeed, the evidence showed that, in its pay estimate submitted for January, 1975, the Contractor billed the Owner for billings submitted by certain subcontractors and suppliers, was paid by the Owner, and yet failed to pay those very subcontractors and suppliers.

The Court therefore holds that the Contractor was in default prior to the Surety's receipt of contract funds on April 10, 1975, and that therefore the Surety was properly entitled to the funds it received that day. Accordingly, judgment for the defendant Surety will be entered, with costs to be borne by the plaintiff Bank.